LUCY M. FAVROW *v.* JACQUELINE VARGAS
(14432)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued March 24—decision released July 7, 1992

*Henry D. Marcus,* for the appellant (petitioner).

*Jacqueline A. Wilson,* for the appellee (respondent).

*Richard Blumenthal,* attorney general, and *Rochelle Homelson,* assistant attorney general, filed a brief for the state of Connecticut as amicus curiae.

BORDEN, J. The principal issue in this appeal is whether a trial court may properly order a deviation from the child support guidelines promulgated pursuant to General Statutes § 46b-215b[1] solely on the basis of the noncustodial parent's actual living expenses. The petitioner, Lucy M. Favrow, appeals[2] from the order of the trial court directing the respondent, Jacqueline Vargas, to pay the petitioner $7.50 per week in current child support for each of two minor children of the respondent, and denying the petitioner's request for a finding of and order on an arrearage for past child support. The petitioner claims that the trial court improperly (1) deviated from the guidelines, and (2) denied her request for an arrearage order. We reverse the order on both issues, and remand the case for a new hearing.

[1] General Statutes § 46b-215b provides: "GUIDELINES TO BE USED IN DETERMINATION OF AMOUNT OF SUPPORT. PRESUMPTION. (a) The child support guidelines promulgated pursuant to section 8 of public act 85-548 and any updated guidelines issued pursuant to section 46b-215a shall be considered in all determinations of child support amounts within the state. In all such determinations there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the commission under section 46b-215a, shall be sufficient to rebut the presumption in such case.

"(b) In any proceeding for the establishment or modification of a child support award, the child support guidelines shall be considered in addition to and not in lieu of the criteria for such awards established in sections 46b-84, 46b-86, 46b-130, 46b-171, 46b-172, 46b-198, 46b-215, 17-324 and 17-578."

[2] The petitioner appealed from the order of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

The relevant facts are as follows. The petitioner is the legal guardian of two of the respondent's minor children, Noemi Maldonado, born February 27, 1979, and Janet Mercado, born January 14, 1985 (children), who reside with the petitioner and her husband.[3] These children were born to the respondent during her marriages to their fathers, Eduardo Maldonado and Edwin Mercado, respectively.

In May, 1991, the petitioner filed verified petitions for support pursuant to General Statutes § 46b-215,[4]

---

[3] The petitioner is also the guardian of a third minor child of the respondent who is in the custody of the department of children and youth services and whose support is not at issue in this case. The petitioner's husband is not a guardian of any of the respondent's children.

[4] General Statutes § 46b-215 provides: "RELATIVES OBLIGED TO FURNISH SUPPORT, WHEN. ORDERS. (a) The superior court or a family support magistrate shall have authority to make and enforce orders for payment of support against any person who neglects or refuses to furnish necessary support to his or her spouse or a child under the age of eighteen, according to his or her ability to furnish such support, notwithstanding the provisions of section 46b-37. Proceedings to obtain such orders of support shall be instituted by a verified petition with summons and order, in a form approved by the chief court administrator, of the husband or wife, child or any relative or the conservator, guardian or support enforcement officer, town or state, or any selectmen or the public official charged with the administration of public assistance of the town, or in AFDC support cases, as defined in subdivision (15) of subsection (b) of section 46b-231, the commissioner of human resources, filed in the judicial district in which the petitioner or respondent resides or does business, or if filed in the family support magistrate division, in the judicial district in which the petitioner or respondent resides or does business. For purposes of this section, the term 'child' shall include one born out of wedlock whose father has acknowledged in writing his paternity of such child or has been adjudged the father by a court of competent jurisdiction, or a child who was born before marriage whose parents afterwards intermarry. Said court or family support magistrate shall also have authority to make and enforce orders directed to the conservator or guardian of any person, or payee of social security or other benefits to which such person is entitled, to the extent of the income or estate held by such fiduciary or payee in any such capacity. Said court or family support magistrate shall also have authority to determine, order and enforce payment of any sums due under a written agreement to support against the person liable for such support under such agreement. Said court or family support magistrate shall also have authority to determine, order and enforce

alleging that the respondent had "failed, neglected and refused" to support the children, and requesting an order of support and a finding of and an order on an

payment of any support due because of neglect or refusal to furnish support prior to the action. Upon the filing of such petition, the judge or family support magistrate shall cause a summons, signed by him or by the clerk or assistant clerk of said court or family support magistrate division, to be issued requiring such liable person or persons to appear in court or before a family support magistrate, at a time and place named, for a hearing upon such petition. Service may be made by any proper officer or by any investigator employed by the department of human resources or the state department of income maintenance or by the commissioner of administrative services. Upon proof of the service of the summons to appear in court or before a family support magistrate at the time and place named for hearing upon such petition, the failure of the defendant or defendants to appear shall not prohibit the court or family support magistrate from going forward with the hearing. In the case of a person supported wholly or in part by a town, the welfare authority of the town shall notify the responsible relatives of such person of the amount of assistance given, the beginning date thereof and the amount of support expected from each of them, if any, and if any such relative does not contribute in such expected amount, the superior court for the judicial district in which such town is located or a family support magistrate sitting in the judicial district in which such town is located may order such relative or relatives to contribute to such support, from the time of the beginning date of expense shown on the notice, such sum as said court or family support magistrate deems reasonably within each such relative's ability to support such person. The court, or any judge thereof, or family support magistrate when said court or family support magistrate is not sitting, may require the defendant or defendants to become bound, with sufficient surety, to the state, town or person bringing the complaint, to abide such judgment as may be rendered on such complaint. Failure of the defendant or defendants to obey any order made hereunder, may be punished as contempt of court and the costs of commitment of any person imprisoned therefor shall be paid by the state as in criminal cases. Upon proof of the service of the summons to appear in court or before a family support magistrate at the time and place named for a hearing upon the failure of the defendant or defendants to obey such court order or order of the family support magistrate, the court or family support magistrate may order a capias mittimus be issued, and directed to some proper officer to arrest such defendant or defendants and bring him or them before the superior court for the contempt hearing. When any person is found in contempt under this section, the court or family support magistrate may award to the petitioner a reasonable attorney's fee and the fees of the officer serving the contempt citation, such sums to be paid by the person found in contempt. In addition to or in lieu of such contempt proceedings the court

arrearage. At the hearing on the petition, held on July 16, 1991, the parties filed financial affidavits and presented oral argument.

or family support magistrate, upon a finding that any person has failed to obey any order made hereunder, may issue an order directing that execution issue against such amount of any debt accruing by reason of personal services as provided by sections 52-362, 52-362b and 52-362c, and may further order executions against any real, personal, or other property of such person which cannot be categorized solely as either, for payment of accrued and unpaid amounts due under such order. No entry fee, judgment fee or any other court fee shall be charged by the court or the family support magistrate to either party in proceedings under this section. Any written agreement to support which is filed with the court or the family support magistrate division shall have the effect of an order of the court or a family support magistrate.

"(b) The attorney general of the state of Connecticut and the attorney representing a town, shall become a party for the interest of the state of Connecticut and such town, in any proceedings for support which concerns any person who is receiving or has received public assistance or care from the state or any town. The attorney general shall represent the IV-D agency in non-AFDC IV-D support cases if the IV-D agency determines that such representation is required pursuant to guidelines issued by the commissioner of the department of human resources.

"(c) The court or a family support magistrate may direct all orders of support to be made through the support enforcement division and shall direct payments made under such orders to the commissioner of administrative services, with authority residing in the support enforcement division to enforce all orders directed for its supervision.

"(d) No order for support made by the court or a family support magistrate shall be stayed by an appeal but such order shall continue in effect until a determination is made thereon upon such appeal; if however as a result of such appeal or further hearing, the amount of such order is reduced or vacated, such defendant shall be credited or reimbursed accordingly.

"(e) Any court or family support magistrate, called upon to enforce a support order, shall insure that such order is reasonable in light of the obligor's ability to pay. Any support order entered pursuant to this section, or any support order from another jurisdiction subject to enforcement by the state of Connecticut, may be modified by motion of the party seeking such modification upon a showing of a substantial change in the circumstances of either party or upon a showing that such support order substantially deviates from the child support guidelines established pursuant to section 46b-215a, unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate, provided the court or family support magistrate finds that the obligor or the obligee and any other interested party have received actual notice of the pendency of such motion and of the time and place of the hearing on such motion. No such support orders

The respondent's affidavit indicated that she was employed at an insurance company, that she had a gross weekly income of $261.51, and a net weekly income of $212.10 after deductions for federal income taxes and social security. Her affidavit also indicated total weekly expenses of $295.75, consisting of $133.75 for rent, $7.50 for electricity, $50 for telephone, $60 for food, $3 for public transportation, $10 for laundry, and $31.50 for church contributions.

The petitioner's affidavit indicated that she was employed as a legal secretary, and that she had a gross weekly income of $600, and a net weekly income of $473.10 after deductions for federal income taxes, social security and medicare. Her affidavit also disclosed her husband's gross weekly income of $1127.17 and his net weekly income of $773.61 after deductions for federal income taxes, social security, medicare, various insurance expenses, and savings bonds and charities. The petitioner's affidavit also indicated total weekly expenses for both her and her husband of $1396.97. That figure included $373.14 in weekly payments on credit card and similar debts totaling $29,236.83.

The petitioner requested that the trial court order current support in the total amount of $75 per week for the children, which was in accordance with the guidelines.[5] The respondent argued that the guidelines

may be subject to retroactive modification, except that the court or family support magistrate may order modification with respect to any period during which there is a pending motion for a modification of an existing support order from the date of service of the notice of such pending motion upon the opposing party pursuant to section 52-50. In any hearing to modify any support order from another jurisdiction the court or the family support magistrate shall conduct the proceedings in accordance with the procedure set forth in section 46b-197.''

[5] In response to questions from the trial court, the petitioner indicated that, although there were outstanding orders of support and wage executions against the fathers of the children, those orders had yielded only $14 in the previous seven weeks.

should not apply,[6] and that a total weekly payment of $50 for the children was appropriate.

With regard to the arrearage sought by the petitioner,[7] the respondent represented that, following her participation in an alcohol rehabilitation program, she had begun working full time in May, 1991. She argued, nonetheless, that because the petitioner had not previously moved in court for a support order, there had been no neglect or refusal by the respondent to furnish support for the children, and thus that the petitioner had established no statutory basis for an order of arrearage.

The trial court found that application of the guidelines would be inequitable or inappropriate. Its stated rationale for that finding was the "[respondent's] liv-

[6] The respondent offered two bases for departing from the application of the guidelines: (1) since the petitioner's affidavit indicated a high level of combined income for her and her husband and many weekly expenses— particularly the credit card liabilities—that, in the respondent's view, "ha[d] nothing to do in the majority as regards the care and maintenance" of the children, the respondent "shouldn't have to pay in order to maintain a living household and a style of living that she's not a party to"; and (2) since the petitioner had become the guardian of the children when the respondent was an alcoholic and unfit to care for the children, and since the respondent had now turned her life around and was sober and working, she now wanted to reestablish her relationship with the children. She argued that application of the guidelines would cripple her attempt to rehabilitate herself and cripple her attempt to reunite with her children. In view of our conclusions that the trial court improperly employed the respondent's actual living expenses as the sole basis for its decision to deviate from the guidelines and that a new hearing is required, we need not determine whether either of these bases would satisfy the deviation criteria established under General Statutes § 46b-215b.

[7] The petitioner sought an arrearage in the amount of $17,940, calculated on the basis of her belief that the respondent had been employed for the previous one and one-half or two years. The petitioner also suggested an order on this arrearage of $25 per week. That amount, however, was to be included in the total weekly order sought of $75, to be allocated $50 for current support and $25 on the arrearage.

ing costs."[8] After eliminating certain of the respondent's expenses as shown on her affidavit, the court entered an order of current support of $7.50 per week for each child, or a total weekly order of $15. The court denied the petitioner's claim for an arrearage upon the basis that, because the respondent "was never formally notified of any demand being made on her prior to this action being commenced . . . [t]he Court will not make a finding that she neglected or refused to provide support for the children." This appeal followed.

I

We first consider the petitioner's challenge to the trial court's order of current child support. The petitioner[9] claims that the trial court improperly

[8] Although in its oral decision from the bench the trial court also adverted to three other factors—namely, (1) the absence of payments by the natural fathers of the children and the effect thereof on the respondent, (2) the presence of the "step-parent . . . in the equation," and (3) the court's perception that the respondent's offer of $50 per week would set her up for defeat when she was trying to rehabilitate herself and regain custody of her children—it is clear that the basis of its decision not to apply the guidelines was the fact that applying the guidelines would not leave the respondent with enough money for the basic necessities of living. In invoking the statutory exception to the guidelines, the court stated that "what the guidelines don't always take into consideration is that shelter, food and utilities and clothing . . . are necessities of life. And before we get past necessities, we can't start talking about the ability to support." The court also stated that "the Commission members [who] . . . set up these guidelines . . . didn't take into consideration that there is a basic necessity level that people have to get by before we start talking about discretionary income." The court then concluded: "Therefore, I am going to make a finding in this case that the application of the guidelines in this case would be unfair and inappropriate." Whatever slight ambiguity there may have been about the basis of the trial court's decision, moreover, is completely dispelled by its written order, as follows: "(x) Order is outside Guidelines. Rationale: [Respondent's] living costs." (Emphasis in original.)

[9] Although the petitioner has phrased her claims on appeal somewhat differently than the state of Connecticut as amicus curiae has phrased the claims, we conclude that the phrasing of the claims of the amicus more accurately presents the issues. We therefore consider the claims of the amicus as those of the petitioner.

deviated from the child support guidelines for reasons not articulated or contemplated by the guidelines. Conversely, the respondent claims that the trial court was within its discretion because it properly found that application of the guidelines would have been inequitable and inappropriate in this case. We agree with the petitioner.

Some history is in order. In 1984, by Special Act No. 84-74 the legislature established pilot programs of mediation and conciliation in the Fairfield and Litchfield judicial districts.[10] Special Acts 1984, No. 84-74, § 1. The special act had two major goals: (1) to "[e]stablish pilot programs at the two court locations for the mediation of contested child custody, visitation, property and financial issues related to dissolution of marriage proceedings"; and (2) "[a]ppointment of an inter-agency commission to develop family support guidelines to be used by Family Relations Counselors in the mediation of dissolution proceedings in the two Judicial Districts."[11] Report of the Commission on Family Support

---

[10] Special Acts 1984, No. 84-74, § 1, provides: "There shall be established in the judicial districts of Fairfield and Litchfield a pilot program of mediation and conciliation services for persons filing for dissolution in such judicial districts. Mediation and conciliation services shall include property, financial, custody and visitation counseling services as well as educational programs concerning custody and property issues, financial matters and dealing with children."

[11] Special Acts 1984, No. 84-74, § 2, provides: "There is established a commission consisting of three employees of the judicial department, appointed by the chief court administrator, two employees of the office of the attorney general, appointed by the attorney general and two employees of the department of human resources appointed by the commissioner of said department. The commission shall, not later than January 1, 1986, develop for each judicial district offering mediation and conciliation services in dissolution proceedings, a guideline for support standards to be used by family relations counselors in the mediation of dissolution proceedings. Such guidelines shall reflect the financial assets and needs of each party, including but not limited to: The present and potential earning capacity of each party; the division of jointly held property and debts; the value of, and the income producing capacity of, solely held assets, including retirement and deferred

Guidelines, Guidelines for Support Standards (October, 1985) p. 1 (1985 Guidelines). Thus, these guidelines were specifically for the use of family relations counselors in mediating and conciliating disputes and were not aimed at the discretion of the court in entering such orders.

Pursuant to that statutory mandate, the commission appointed thereunder developed a set of guidelines for support of minor children "based on expected levels of support to be provided by a spouse or parent depending on the income and current situation of each adult, total family income, and the number of persons in need of support." 1985 Guidelines, p. 2. The commission specifically made the guidelines flexible and nondirective. The commission stated that the guidelines "reflect an integration of national averages for the costs of child rearing in families of varying size and income levels as well as the usual range of obligations established by families and the courts. They are not intended to transform the sensitive process of determining the equitable allocation of family support responsibilities into a fixed and rigid mathematical formula. Rather, the purpose is to provide a framework within which the unique characteristics of each family can be examined in an orderly fashion to construct an allocation of financial responsibility responsive to the needs of all family members as well as to the community." 1985 Guidelines, pp. 1–2. In keeping with this flexible and nondirective approach, the commission also stated: "In most situations, support obligations are not dependent upon current adult expenses as it is anticipated that parents must adjust their expenses in accordance with the priority of their obligations, with the support of a depen-

income plans; special needs of children to be supported by either party; alimony; and the eligibility of either of the parties for support under chapter 302 or chapter 308 of the general statutes. The chief court administrator shall designate a chairman of the commission."

dent spouse or child being the primary obligation. In appropriate circumstances, however, fixed obligations may be considered." 1985 Guidelines, p. 2. The commission also stated that the guidelines were not intended to preclude consideration of thirteen "other factors relevant to the allocation of financial responsibility," the last listed of which was "[o]ther reasonable considerations."[12] 1985 Guidelines, pp. 2, 3.

Two provisions of these guidelines are relevant to the issue in this case. The provision entitled "Maximum Family Support" stated that the "guidelines intend that the spousal support determination occur within the context of the disposable income of the non-custodial parent *after* the child support obligation is established and with the proviso that the retained income of the non-custodial parent in no case be reduced to below 40%, or $100.00, whichever is greater, for any combination of child support and spousal support. The amount of disposable income available for spousal support is the difference between the expected child support and the Maximum Family Support." (Emphasis in original.) 1985 Guidelines, p. 5. The provision entitled "Limit On Maximum Support To Be Ordered" provided as follows: "The guidelines presume that as a rule the retained income of the support obligor will not be reduced below 40%, or $100.00, whichever is greater. The rationale for this proviso is that reduction below 40%, or $100.00, may have the effect of undermining an obligor's incentive to remain employed." 1985 Guidelines, p. 6. Thus,

---

[12] The first twelve factors included: the assets and unique needs of each party; the parties' earnings capacities; the division of jointly held property, assets and debts; the value of retirements and deferred income plans; special needs of children; alimony; the eligibility of either party for support from the state pursuant to chapters 302 and 308 of the General Statutes; the amount of public assistance available to the custodial parent; the needs of other dependents; unreimbursable medical costs; the ages and health of the parties and children; and the needs of a second or prior family. 1985 Guidelines, pp. 2–3.

these two provisions established as a baseline that, within the boundaries of the flexible and nondirective approach of the guidelines, the noncustodial parent would be permitted to retain the greater of 40 percent of his or her other disposable income or $100 per week.

The commission also recommended that the proposed guidelines be used statewide by family relations counselors as part of the mediation process. 1985 Guidelines, Pilot Program Report and Recommendations addendum, p. 2. In a further addendum to the report, the mediators appointed under the statute recommended that the guidelines "be formally incorporated as guidelines to be considered by judges in the adjudication of family support matters." 1985 Guidelines, Commentary addendum, p. 4.

Thereafter, in 1985 the legislature enacted No. 85-548 of the Public Acts, entitled "An Act Implementing the Federal Child Support Enforcement Amendments of 1984."[13] Section 8 of that Public Act established a com-

[13] Number 85-548 of the 1985 Public Acts was enacted in response to federal legislation regarding support for children. "Since 1984, the United States Congress has actively encouraged states to take measures to assure that children receive adequate financial support from their parents, thereby reducing governmental expenditures for support of children. The Child Support Enforcement Amendments of 1984, enacted as Public Law 98-378 and codified at 42 U.S.C. § 666 et seq., amended part D of title IV of the Social Security Act to require that states establish procedures to improve the effectiveness of child support enforcement (IV-D) programs. In those amendments, Congress conditioned the states' receipt of federal funds for AFDC programs and for IV-D programs upon compliance with these requirements. Among the requirements was a provision directing states to establish, by law or by judicial or administrative action, guidelines for child support award amounts that would be available to, but not binding upon, judges who had the authority to enter child support orders. 42 U.S.C. § 667 (a). Such guidelines were intended to provide reliable benchmarks for use in quasi-judicial proceedings, to expedite awards of child support, and to guide courts to more equitable awards in order to address the 'feminization of poverty' resulting from consistent underestimates of the cost of rearing children by increasing the average level of awards. See, e.g., R. D. Thompson & S. F. Paikin, 'Formulas and Guidelines for Support,' 36 Juv. & Fam. Ct. J. 33 (1985)." *Turner* v. *Turner*, 219 Conn. 703, 713–14, 595 A.2d 297 (1991).

mission "to develop guidelines, not later than January 1, 1987, for child support award amounts within the state. Such guidelines shall be available but not binding upon judges and other officials who have the power to determine child support awards."[14] This legislation, therefore, provided for a set of child support guidelines, and expanded their use from the family relations counselors to the court. The guidelines, although made "available" to the court, were in no way binding on it. These guidelines were in all essential characteristics identical to those established pursuant to Special Act No. 84-74. See Guidelines For Child Support Standards Developed Pursuant to Public Acts 1985, No. 85-548 by the Commission on Support Guidelines.

In 1989, the legislature enacted No. 89-203 of the Public Acts, entitled "An Act Concerning Child Support Guidelines."[15] Section 1 of that act established a third "commission for child support guidelines." This commission was given three specific statutory mandates: "[1] to review the child support guidelines

---

[14] Number 85-548, § 8, of the 1985 Public Acts provides: "A commission consisting of three employees of the judicial department, appointed by the chief court administrator, two employees of the office of the attorney general, appointed by the attorney general and two employees of the department of human resources appointed by the commissioner of human resources shall be established to develop guidelines, not later than January 1, 1987, for child support award amounts within the state. Such guidelines shall be available but not binding upon judges and other officials who have the power to determine child support awards."

[15] Like No. 85-548 of the 1985 Public Acts, No. 89-203 of the 1989 Public Acts was enacted in response to federal legislation. "Four years [after the enactment of The Child Support Enforcement Amendments of 1984] . . . Congress enacted the Family Support Act of 1988 to increase the responsibility of the states to assist all families, including those who do not receive welfare assistance, to establish, modify and enforce support obligations. Public Law 100-485, codified at 42 U.S.C. § 666 et seq. Section 103 (a) of the 1988 act required the states to create a rebuttable presumption that the amounts recommended in the child support guidelines are the correct amounts to be awarded." *Turner* v. *Turner,* 219 Conn. 703, 714, 595 A.2d 297 (1991).

promulgated pursuant to section 8 of public act 85-548, [2] to establish criteria for the establishment of guidelines to ensure the appropriateness of child support awards and [3] to issue updated guidelines not later than January 1, 1991 and every four years thereafter." Public Acts 1989, No. 89-203, § 1. Section 1 of that public act is now codified as General Statutes § 46b-215a.[16] Sections 2 and 3 of that public act are now codified as General Statutes (Rev. to 1991) § 46b-215b. See footnote 1, supra.

Section 46b-215b (a) made four significant changes in the application of the guidelines to questions of child support. These four changes, moreover, displaced the flexible and nondirective approach taken by the previous sets of guidelines. First, § 46b-215b (a) provides that the guidelines "shall be considered in all determinations of child support amounts within the state." Second, the statute provides that "there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support to be ordered." Third, in order for a court or magistrate "to rebut the presumption in such case," it must make a "specific finding on the record that the application of the guidelines would be

[16] General Statutes § 46b-215a provides: "COMMISSION FOR CHILD SUPPORT GUIDELINES. DUTIES. MEMBERS. The commission for child support guidelines is established to review the child support guidelines promulgated pursuant to section 8 of public act 85-548, to establish criteria for the establishment of guidelines to ensure the appropriateness of child support awards and to issue updated guidelines not later than January 1, 1991, and every four years thereafter. The commission shall consist of eleven members as follows: The chief court administrator or his designee, the commissioner of human resources or his designee, the attorney general or his designee, the chairpersons and ranking members of the joint standing committee on judiciary or their designees and a representative of the Connecticut Bar Association, a representative of legal services, a person who represents the financial concerns of child support obligors and a representative of the permanent commission on the status of women, all of whom shall be appointed by the governor. The chairperson of the commission shall be elected by the members of the commission."

inequitable or inappropriate in a particular case."
Fourth, such a specific finding must be "determined
under criteria established by the commission."

In response to these statutory mandates, the com-
mission promulgated new guidelines. In its final report,
issued in January, 1991, the commission observed that
the new guidelines "have been working quite well since
they have been used as a rebuttable presumption by
judges and magistrates. The order establishment pro-
cess has been expedited; and although there has been
some inconsistent application, orders of support are
generally more consistent. Generally, there is less liti-
gation, and much more thought is being given to the
reasons for deviation from the guidelines." Final
Report of the Commission for Child Support Guidelines
(January, 1991) p. 3 (1991 Guidelines).

With respect to the deviation criteria mandated by
§ 46b-215b (a), the commission found that the "devia-
tion criteria should be more clearly specified. The guide-
lines therefore include a complete listing of specific
deviation criteria. In addition, the Commission has
expanded the general criteria to ensure that orders are
in the best interests of the child and are equitable to
the financial interests and needs of the parties." 1991
Guidelines, p. 3. Accordingly, the commission specified
fourteen deviation criteria, the last of which, relevant
here, was "other equitable factors."[17] 1991 Guidelines,
p. 9.

The commission, moreover, specifically addressed
the issue of the noncustodial parent's actual living

---

[17] The first thirteen deviation criteria included: the substantial assets of
a party; earning capacity of a party; division of property, assets and debts;
special needs of the child; extraordinary educational expenses; alimony;
needs of other dependents; extraordinary unreimbursable medical expenses;
shared custody arrangements; tax consequences; significant visitation
expenses; parental support available to a minor parent; and the best inter-
ests of the child. 1991 Guidelines, pp. 8–9.

expenses. Under the heading, "Non-Custodial Parent's Self Support Reserve," the commission stated: "In general, support obligations should not be dependent on current adult expenses because parents must adjust their expenses in accordance with the priority of their obligations, with the support of dependents being a primary obligation. However, it is important that the non-custodial parent be allowed to retain sufficient income to support him/herself at some minimal level in order not to undermine his/her incentive to remain employed. In view of these concerns, the Commission finds that the $100 or 40% of net income self-support reserve for the non-custodial parent under the current guidelines is too low due to the increased cost of living. Therefore, the Commission finds that the non-custodial parent's self-support reserve should be increased to $135 per week, taking into account that the poverty income level for one person is $120.44 as of July, 1990." 1991 Guidelines, p. 4.[18]

This history strongly suggests three conclusions. First, underlying the entire notion of the mandatory child support guidelines is the fundamental principle that, unless a specific deviation criterion applies, "support obligations should not be dependent on current adult expenses because parents must adjust their expenses in accordance with the priority of their obligations, with the support of dependents being a primary obligation." 1991 Guidelines, p. 4. Although this principle was specifically stated in the 1991 Guidelines mandated by the 1989 legislation, its applicability was evident even in the context of the precursor legislation.

---

[18] The commission also specifically determined that where a minor noncustodial parent lives at home and is supported in part by his or her parents, the court should be permitted to deviate from the guidelines by leaving the parent with less than $135 per week. 1991 Guidelines, p. 5. Significantly, there was no corresponding specific determination that a finding of actual living expenses of the noncustodial parent amounting to more than $135 per week should by itself trigger a deviation from the guidelines.

In accordance with this principle, the commission specifically set $135 per week as the presumptive permissible ceiling on the noncustodial parent's reserve for living expenses.

Second, the deviation criteria must be read so as to be consistent with this fundamental principle. Just as different statutes must be read so as to form a consistent whole; *84 Century Limited Partnership* v. *Board of Tax Review*, 207 Conn. 250, 265, 541 A.2d 478 (1988); the deviation criteria must be read, insofar as possible, so as to form a consistent whole with the guidelines, both of which were issued by the same commission.

Third, the guidelines evolved from an experimental, intentionally nondirective and flexible approach to the imposition of standards that are presumptively binding on the court or magistrate, from which deviations would be permitted only in accordance with specific findings related to specific criteria established by the commission. Thus, in general, the 1989 legislation and the ensuing work of the commission substantially circumscribes the traditionally broad judicial discretion of the court in matters of child support.

These conclusions lead us to conclude, further, that the trial court went beyond its permissible bounds in deviating from the guidelines in this case. The only deviation criterion at issue in this case is the fourteenth, namely, "other equitable factors." The trial court did not rely on any other criterion, and the respondent does not argue for the applicability of any other. It is true that the language of that criterion is very broad and would, at first glance, appear to give the trial court almost as much discretion as it had before the promulgation of the guidelines. To read this criterion, however, so as to permit the court to deviate from the guidelines solely on the basis of the noncustodial par-

ent's actual living expenses, even when they are relatively modest in amount, would in effect permit the exception to swallow the rule.

Permitting such an application of the deviation criteria would be inconsistent with the fundamental principle underlying the guidelines, namely, that support obligations of parents should not be dependent upon their current living expenses but that those expenses must give way to support obligations. Furthermore, to give precedence to current living expenses would be to read the catch-all, fourteenth deviation criterion so as to be inconsistent with and, in effect, to govern the application of the guidelines themselves. Finally, to do so would be inconsistent with the circumscribed discretion that the guidelines have imposed on the trial court by the 1989 legislation that replaced the broad discretion that the trial court had in such matters before the promulgation of the guidelines. In sum, therefore, in the present case the trial court's order finding a deviation from the guidelines on the basis of the respondent's actual living expenses amounted to a disagreement with the guidelines themselves, rather than an application of the deviation criteria established by the commission.

We recognize that, particularly at the lowest end of the financial spectrum as reflected in the guidelines, the amount left for the noncustodial parent's self-support reserve may well be penurious, if not inadequate.[19] The legislature, however, left the difficult policy determination of the appropriate level of that reserve, not to the court, but to the commission. It was not the trial court's function, nor is it this court's function, to countermand that essentially legislative determination. See *Mercado* v. *Commissioner of Income Maintenance*, 222 Conn. 69, 77, 607 A.2d 1142 (1992).

[19] We note, however, that in this case the trial court, in ordering only $15 per week support for the two children, went below even what the respondent felt she could afford to pay, $50 per week.

We recognize, moreover, as is implicit in the work of the commission, that every dollar of deviation downward from the guidelines, as the trial court ordered in this case, shifts that dollar of support for the children involved from the shoulders of one primary obligor, namely, a parent, onto the shoulders of another person—in this case, the custodian of the children. Thus, the legislative determination made by the commission in its guidelines must be regarded with some degree of deference, because it reflects that difficult policy choice.

## II

The petitioner also claims that the trial court improperly denied her request for an arrearage order because there had been no formal demand made upon the respondent for support prior to this petition. We agree.

General Statutes § 46b-215 provides in pertinent part: "The superior court or a family support magistrate shall have authority to make and enforce orders for payment of support against any person *who neglects or refuses* to furnish necessary support to . . . a child under the age of eighteen, according to his or her ability to furnish such support . . . ." (Emphasis added.) There is nothing in this language, or in the important public policy that it reflects, to suggest that the obligation of a parent to support her child, according to her ability, is subject to a condition precedent of a formal demand. That obligation is ongoing, and does not require the trigger of a request by those persons who are shouldering that responsibility.

The order is reversed, and the case is remanded for a new hearing on the petition.

In this opinion PETERS, C. J., CALLAHAN and GLASS, Js., concurred.

BERDON, J., concurring. I concur in the result.