# MICHAEL J. O'BRIEN *v.* KATHLEEN E. O'BRIEN
## (AC 31990)

Lavine, Sheldon and West, Js.

Argued January 5—officially released October 16, 2012

*Steven D. Ecker*, with whom, on the brief, was *Ann Walsh Henderson*, for the appellant (plaintiff).

*George J. Markley*, for the appellee (defendant).

### Opinion

SHELDON, J. In this marital dissolution action, the plaintiff, Michael J. O'Brien, appeals from the judgment of the trial court with respect to several of the financial orders entered at the time of its final decree. Among other orders herein challenged is the court's unallocated award of alimony and child support for the defendant, Kathleen E. O'Brien, and the parties' minor children.[1] Central to the plaintiff's challenge to this award is his claim that, in so ordering, the court failed to consider and apply the child support guidelines (guidelines).[2] On this score, the plaintiff complains,

[1] The plaintiff also claims that the court erred in failing to assign to the defendant an earning capacity and thus consider that earning capacity in rendering its financial orders and improperly ordering him to maintain a life insurance policy for the defendant's benefit for as long as his lifetime alimony obligation to the defendant endures. The dissent has opined that the trial court's judgment should be affirmed with respect to these additional claims. Because we reverse the judgment of the trial court on the basis explained herein, and remand the case for a new trial on all financial issues, we offer no view on those claims.

[2] The guidelines are set forth in § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies and are promulgated by the commission for child support guidelines established pursuant to General Statutes § 46b-215a.

more particularly, that the court erred by failing to determine the presumptive amount of child support under the guidelines, failing to make a finding that the application of the guidelines would be inequitable or inappropriate in this case, and failing to indicate that it was deviating from the guidelines when it fashioned its unallocated alimony and child support order.[3] Because we agree with the plaintiff that the court erred in entering its unallocated alimony and child support order without considering and applying the guidelines, and we conclude that that order is inextricably interwoven with the mosaic of other financial orders that were entered at the time of the final decree, we reverse the court's judgment with respect to all of its final financial orders and remand this case for a new trial on all financial issues. The plaintiff also claims that the court abused its discretion in ordering him to pay the defendant $50,000 in attorney's fees to defend this appeal. Because such an order must be based upon the financial circumstances of the parties, and those financial circumstances may be materially affected by the new financial orders issued on remand, the award of appellate attorney's fees must also be remanded for further consideration.

The following facts are relevant to our resolution of this appeal. The parties were married in 1985, and three children were born of the marriage—the first child on August 9, 1994, the second child on July 2, 1996, and

[3] With regard to the court's child support order, the plaintiff also claims that the court failed to consider or base its award on the needs of the children; that the court improperly based the support order on his gross income rather than his net income; that the award exceeds the maximum presumptive percentage of income permitted under the child support guidelines; and that the court improperly based the award on a percentage of his fluctuating income. Again, because we are reversing the court's financial orders for the reasons set forth herein, and we thus are remanding the case for a new trial on all financial issues, we need not address these additional claims of error.

the third child on May 19, 2000. The plaintiff filed an action seeking dissolution of the parties' marriage on January 30, 2008. In its memorandum of decision filed on September 18, 2009, the court rendered judgment dissolving the parties' marriage, adopting a parenting plan formulated by the parties, and ordering, inter alia, that "[t]he plaintiff shall pay to the defendant, during his lifetime or until the defendant's death or remarriage, the following percentages of his 'gross annual earned income from employment,' as hereinafter defined, as unallocated alimony and child support: a. [45] percent of the plaintiff's 'gross annual earned income from employment' from October 1, 2009 until January 30, 2015; b. [c]ommencing February 1, 2015, [40] percent of the plaintiff's 'gross annual earned income from employment' through July 2, 2024; c. [f]rom July 2, 2024, until the death of either party or the defendant's remarriage, whichever shall first occur as defined by statute, [20] percent of the plaintiff's 'gross annual earned income from employment' as alimony."[4] This appeal followed.[5] Thereafter, on February 25, 2010, the defendant filed a postjudgment motion for attorney's fees

[4] The plaintiff also claims that when the court later issued a clarification of the judgment, it improperly changed the unallocated award in a substantial and material way. Because we reverse the judgment of the court and the periodic orders will be reconsidered in their entirety, we need not address the court's purported clarification.

[5] In its memorandum of decision dissolving the parties' marriage and issuing associated financial orders, the court did not set forth any findings as to the parties' incomes, careers or earning capacities, other than noting that the "[defendant] has been away from her career for some period" and that "she will take little time in reacquiring her exceptional skills." On December 3, 2010, in a subsequent articulation in response to an order from this court, the court indicated that: "At the time of the dissolution the court found that [the] defendant was a stay-at-home mother and she served in that capacity at the plaintiff's request. Obviously, after the children [are] grown, she would have earning capacity based on her education and prior abilities. It would be premature to assess earning capacity for some future date. Obviously, the defendant is well educated, earned large sums of money, and she has maintained her skills. . . . The court considered the parties' lifestyle during the marriage and the necessity of protecting the wife for the rest of her life. As of April 21, 2009, according to [the] plaintiff's [financial]

to defend this appeal. The court granted that motion, issuing an order that the plaintiff pay the defendant $50,000 in appellate attorney's fees. The court subsequently articulated the basis of this order as follows: "The defendant is defending an appeal that is frivolous. To not award her attorney fees to defend could undermine other awards."

On appeal, although the plaintiff presents several claims of error with respect to the court's unallocated award of alimony and child support, we will focus on the most fundamental of those claims—that in fashioning that award, the court erred in failing to consider and apply the guidelines. On this score, to reiterate, the plaintiff specifically claims that the court erred by failing to determine the presumptive child support amount under the guidelines, failing to make a finding that the application of the guidelines would be inequitable or inappropriate under the circumstances of this case, and failing to indicate that it was deviating from the guidelines when it entered its unallocated, or "total family support," order pursuant to § 46b-215a-3 (b) (5) of the Regulations of Connecticut State Agencies. We agree.

We begin our analysis of the plaintiff's claim by identifying the appropriate standard of review. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a

affidavit, he had gross earnings and gross income of $17,414 per week gross which resulted in a net [of] $10,900 per week."

trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Williams*, 276 Conn. 491, 496–97, 886 A.2d 817 (2005).

"The legislature has enacted several statutes to guide courts in fashioning child support orders. General Statutes § 46b-84 provides in relevant part: '(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. . . . (d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . .'

"To ensure the appropriateness of child support awards, General Statutes § 46b-215a provides for a commission to oversee the establishment of child support guidelines. General Statutes § 46b-215b requires that '[t]he . . . guidelines . . . be considered in *all* determinations of child support amounts . . . . [T]here shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support . . . . A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the Commission for Child Support Guidelines

under section 46b-215a, *shall be required* in order to rebut the presumption in such case.'

"The guidelines incorporate these statutory rules and contain a 'schedule' for calculating 'the basic child support obligation,' which is based on the number of children in the family and the combined net weekly income of the parents. Regs., Conn. State Agencies § 46b-215a-2b (f). Consistent with . . . § 46b-215b (a), the guidelines provide that the support amounts calculated thereunder are the correct amounts to be ordered by the court unless rebutted by a specific finding on the record that the presumptive support amount would be inequitable or inappropriate. Regs., Conn. State Agencies § 46b-215a-3 (a). The finding *must* include a statement of the presumptive support amount and explain how application of the deviation criteria justifies the variance. Id.; see also General Statutes § 46b-215b (a). This court has stated that the reason why a trial court must make an on-the-record finding of the presumptive support amount before applying the deviation criteria is to 'facilitate appellate review in those cases in which the trial court finds that a deviation is justified.' . . . In other words, the finding 'will enable an appellate court to compare the ultimate order with the guideline amount and make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion.' " (Citation omitted; emphasis altered.) *Kiniry* v. *Kiniry*, 299 Conn. 308, 318–20, 9 A.3d 708 (2010); see also *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 367–70, 999 A.2d 721 (2010); *Maturo* v. *Maturo*, 296 Conn. 80, 91, 995 A.2d 1 (2010); *Unkelbach* v. *McNary*, 244 Conn. 350, 367–68, 710 A.2d 717 (1998); *Favrow* v. *Vargas*, 231 Conn. 1, 29, 647 A.2d 731 (1994); *Budrawich* v. *Budrawich*, 132 Conn. App. 291, 299–300, 32 A.3d 328 (2011).

Our Supreme Court has recognized that "the guidelines evolved from an experimental, intentionally nondirective and flexible approach to the imposition of

standards that are *presumptively binding* on the court or magistrate . . . . [I]n general . . . the ensuing work of the commission substantially circumscribes the traditionally broad judicial discretion of the court [to deviate from the guidelines] in matters of child support." (Emphasis added.) *Favrow* v. *Vargas*, 222 Conn. 699, 715, 610 A.2d 1267 (1992). Our Supreme Court recently emphasized the importance of the mandatory application of the guidelines to all cases involving minor children, including those cases involving families with high incomes, in *Maturo* v. *Maturo*, supra, 296 Conn. 80. The court there held: "[T]he applicable statutes, as well as the guidelines, provide that *all* child support awards must be made in accordance with the principles established therein to ensure that such awards promote 'equity,' 'uniformity' and 'consistency' for children 'at *all income levels.*' . . . [Child Support and Arrearage Guidelines (2005), preamble], § (c) (1) and (2), p. ii; id., § (e) (6), p. vi. [Section] 46b-84 specifically instructs that courts shall consider various characteristics and needs of the child in determining whether support is required, the amount of support to be awarded and the respective abilities of the parents to provide such support. Although the guidelines grant courts discretion to make awards on a 'case-by-case' basis above the amount prescribed for a family at the upper limit of the schedule when the combined net weekly income of the parents exceeds that limit, which is presently $4000; Regs., Conn. State Agencies § 46b-215a-2b (a) (2); the guidelines also indicate that such awards should follow the principle expressly acknowledged in the preamble and reflected in the schedule that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises. Thus, an award of child support based on a combined net weekly income of $8000 *must* be governed by the same *principles* that govern a child support award based on

a combined net weekly income of $4000, even though the former does not fall within the guidelines' *schedule.* Finally, although courts may, in the exercise of their discretion, determine the correct percentage of the combined net weekly income assigned to child support in light of the circumstances in each particular case, including a consideration of other, additional obligations imposed on the noncustodial parent, any deviation from the schedule or the principles on which the guidelines are based must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why the deviation is necessary to meet the needs of the child. See also General Statutes § 46b-84 (d)." (Emphasis added.) *Maturo* v. *Maturo,* supra, 94–96.

"Neither this court, nor the trial court, is at liberty, where a particular family enjoys a relatively high income, to disregard the significant progress that has been made in standardizing child support awards since the advent of the guidelines. See 42 U.S.C. § 667 (b) (2) (1988). Removing consideration of the guidelines from child support decisions deprives high income families of the fairness and consistency the guidelines require and leaves the trial and appellate courts adrift, unanchored to the core principles that guide support awards in cases falling within the guidelines' schedule." *Maturo* v. *Maturo,* supra, 296 Conn. 113.[6]

---

[6] We note that, not only have the guidelines evolved from a guide to a mandate in all cases in which there are minor children, but the treatment of high income situations has also changed. When the guidelines were established in 1991, they explicitly indicated that they did not apply to cases in which the parties' combined net weekly income exceeded $1500. Rather they established that $1500 was the presumptive minimum level for families exceeding that income. In 1994, the guidelines were revised to establish, inter alia, a new presumptive minimum level of $1750, and eliminated the language that stated that the guidelines do not apply to high income situations. The subsequent revisions to the guidelines, in 1999 and 2005, abide by the principle of the 1994 version, but raise the highest levels of income, and thus the minimum presumptive amounts of child support, to $2500 and $4000, respectively.

Here, based upon our review of the record, it is evident that the court failed to follow, or even make reference to, the guidelines. Nor did the court, as required by the guidelines, determine the presumptive amount of child support to be awarded thereunder.[7] Moreover, having failed to determine the presumptive amount of child support under the guidelines, the court was not in a position to, and did not, make a finding as to whether application of the guidelines would be inappropriate or inadequate in this case. We are thus left to speculate both as to the presumptive child support amount and as to whether, and if so why, the circumstances of this case warranted a deviation from that amount.

The defendant argues, and the dissent agrees, that, because the court issued an unallocated award of alimony and child support, the guidelines do not apply. The law supports no such conclusion. In any marital dissolution action involving minor children, it is axiomatic that the court must fashion orders providing for the support of those children. There is no exception to this mandate, and certainly none for unallocated awards of alimony and child support, which necessarily include amounts for both child support and spousal support. Indeed, our Supreme Court recently confirmed in *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 558, 46 A.3d 112 (2012), that an unallocated order "necessarily includes a portion attributable to child support in an amount *sufficient to satisfy the guidelines.*" (Emphasis added.) *Tomlinson* also confirmed that, when making an unallocated order, the court must: first, determine the presumptive child support amount; second, explicitly find that an award in the presumptive amount would be inequitable or inappropriate under the circumstances

---

[7] As noted, in its initial memorandum of decision dissolving the parties' marriage, the court made no finding as to the parties' incomes.

of the case; and third, explicitly find that, in those circumstances, the entry of an unallocated or total family support order is a justifiable deviation from the presumptive amount for one of the reasons set forth in the guidelines themselves. Id., 558–59. Those reasons are explained in the guidelines as follows: "In some cases, child support is considered in conjunction with a determination of total family support, property settlement, and tax implications. When such considerations will not result in a lesser economic benefit to the child, it may be appropriate to deviate from presumptive support amounts for the following reasons only: (A) division of assets and liabilities, (B) provision of alimony, and (C) tax planning considerations."[8] See Regs., Conn. State Agencies § 46b-215a-3 (b) (5). The fact that the guidelines explicitly authorize the making of an unallocated award of alimony and child support as a permissible deviation from the presumptive amount thereunder undermines the defendant's argument and the dissent's suggestion that the guidelines do not apply at all in cases where such unallocated orders are issued.

---

[8] We recognize that there are federal tax benefits to an unallocated award. When an award is categorized as unallocated, since no part of that award is expressly fixed as child support, the Internal Revenue Code provides that the entire amount may be treated as alimony for taxation purposes, and thus deducted as alimony by the payor. See Internal Revenue Code, 26 U.S.C. §§ 71 and 215. There is, however, no statutory or decisional law suggesting that, if a court decides to make an unallocated award of alimony and child support, it need not, as a preliminary matter, determine the presumptive amount of child support under the guidelines. To the contrary, the court's obligation to fix the presumptive support amount is unchanging, whether or not it ultimately decides to deviate from the guidelines by fashioning such an order. Finally, we do not suggest that, in fashioning an unallocated award, a court must specify how much of that award is earmarked for child support, for such a requirement would frustrate the beneficial tax purposes of an unallocated award. Simply, in fashioning an award of total family support, the court should examine the guidelines, determine the presumptive amount of support thereunder, and then explain its basis for deviating from the guidelines in light of the unfairness or inappropriateness of following them in the case before it. In this regard, the dissent's analysis conflates a court's *finding* of the presumptive amount of child support owed pursuant to the guidelines with the issuance of a child support *order* in that amount.

For the foregoing reasons, we conclude that the court abused its discretion in entering its unallocated award of alimony and child support without considering and applying the guidelines or the principles espoused therein. It erred, more particularly, by failing to determine the presumptive amount of child support under the guidelines, failing to explain that that amount was inequitable or inappropriate, and failing to explain its basis for deviating from the guidelines.

Financial orders in dissolution proceedings often have been described as a mosaic, in which all of the various financial components are carefully interwoven with one another. *Gershman* v. *Gershman*, 286 Conn. 341, 351, 943 A.2d 1091 (2008). Because the court's support orders, particularly its spousal support or alimony order, are informed by and reflective of the parties' incomes and assets, as affected by the court's other financial orders, the entirety of the mosaic must be refashioned whenever there is error in the entering of any such interdependent order. See id., 352. Accordingly, we reverse the judgment of the trial court with respect to all of its financial orders, including, but not limited to those orders challenged on appeal.

As to the court's challenged award of appellate attorney's fees, we recognize that that award was issued postjudgment, not at the time of the entry of the other financial orders which were issued on the date of dissolution. That award is thus not part of the mosaic of final financial orders by which the court initially attempted to chart the parties' financial future. Even so, as the following authorities make clear, the ordering of attorney's fees is itself dependent upon the relative financial circumstances of the parties, as affected by the court's final financial orders. For that reason, the attorney's fees award here at issue must also be reconsidered in light of the new mosaic of financial orders that the court will issue on remand in this case.

"General Statutes § 46b-62 governs the award of attorney's fees in dissolution proceedings and provides that the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in [§ ] 46b-82. These criteria include the length of the marriage, the causes for the . . . dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [§ ] 46b-81 . . . . General Statutes § 46b-82. In making an award of attorney's fees under § 46b-82, [t]he court is not obligated to make express findings on each of [the] statutory criteria. . . . Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . An exception to th[is] rule . . . is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . ." (Citations omitted; internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 385–86.

Here, the court did not make a finding as to the defendant's ability to pay her own attorney's fees. Rather, as previously noted, it opined in its articulation that the plaintiff's appeal was frivolous, and thus that the failure to award the defendant attorney's fees to defend the appeal would undermine the court's other financial orders for her maintenance and support. In so doing, the court properly recognized that its award of attorney's fees is a function of the parties' financial circumstances. Those circumstances, however, depend

directly upon the final financial orders issued by the court in its dissolution judgment. Not until the parties' assets are finally divided and their respective rights and obligations to give or receive financial support to or from each other are finally determined can the parties' ability to pay for their own attorney's fees be ascertained; nor, if it is determined that the parties do have the ability to pay their own attorney's fees, can it finally be determined if the failure to award appellate attorney's fees to the defendant would undermine the court's other financial orders for her maintenance and support. Accordingly, because the court's financial orders will be reconsidered in their entirety on remand, its award to the defendant of $50,000 in appellate attorney's fees must also be remanded for reconsideration in light of the new financial orders that will be issued at that time.

The judgment is reversed only as to the court's financial orders, including the award of appellate attorney's fees, and the case is remanded for a new trial on all financial issues.

In this opinion WEST, J., concurred.

LAVINE, J., dissenting. I respectfully disagree with the majority that the court improperly failed to consider and apply the child support guidelines[1] when it ordered the plaintiff, Michael J. O'Brien, to pay unallocated alimony and child support (unallocated support) to the defendant, Kathleen E. O'Brien. Because I would affirm the judgment with respect to the unallocated support, I also consider the plaintiff's other claims on appeal, which are that it was improper for the court to (1) fail to assign an earning capacity to the defendant, (2) order

---

[1] See Regs., Conn. State Agencies § 46b-215a-1 et seq. The defendant also claims that the court failed to abide by our Supreme Court's decision in *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010). I disagree that *Maturo* applies to the factual circumstances here.

him to maintain life insurance for as long as he has a lifetime alimony obligation, (3) award the defendant appellate attorney's fees and (4) modify the judgment. I would affirm the judgment of the trial court.

Because I consider all of the plaintiff's claims on appeal, the following procedural history and facts found by the court are relevant. The parties were married in 1985 and are the parents of three minor children born on August 9, 1994, July 2, 1996, and May 19, 2000.[2] After the plaintiff initiated this dissolution action in January, 2008, he voluntarily left the marital home. In his complaint, he alleged, in part, that the marriage had broken down irretrievably. The defendant admitted the allegations of the complaint and alleged a cross complaint, in which she sought, among other things, temporary and permanent alimony pursuant to General Statutes §§ 46b-82 and 46b-83 and reasonable attorney's fees pursuant to General Statutes § 46b-62.

The court conducted a trial over several days in April and May, 2009, and issued a memorandum of decision dissolving the parties' marriage on September 18, 2009. The court found considerable disagreement as to the reason for the marital breakdown. The defendant claimed that the plaintiff had had a "roving eye" throughout the marriage and that he had had more than collegial relationships with at least twelve women. She retained a private detective service to monitor the plaintiff's infidelity. The plaintiff claimed that the defendant's unwarranted accusations of infidelity and her control of many aspects of his life had led to the breakdown of the marriage. The court found that the plaintiff had had out-of-marriage relationships with two women before he left the marital home. The court, however, found that the adultery itself was not the cause of the

---

[2] The parties negotiated a parenting plan, which the court approved and incorporated into the judgment of dissolution.

marital breakdown; rather, the plaintiff's dalliances with certain women over the course of the parties' marriage had led to the marital breakdown. The court found substantial evidence that the defendant tried to make the marriage succeed, but that the plaintiff did not have a similar interest. The court found the plaintiff primarily at fault for the breakdown of the marriage.

The court stated that, in formulating its orders, it considered General Statutes §§ 46b-81 and 46b-82, as well as the assets, liabilities, and the gross and net incomes of the parties in entering its orders. It also considered the talent, adeptness and expertise of both parties. The court found that the defendant had been away from her career for some time and will need time to reacquire her exceptional skills.[3] The court awarded the defendant unallocated support[4] to be paid by the plaintiff pursuant to a three stage, step-down plan.[5]

[3] The court found, pursuant to the plaintiff's financial affidavit, that he had gross income of $17,414 per week, which resulted in net income of $10,900 per week. Although the trial court did not make further specific findings of fact as to the parties' employment, for the purposes of context, my review of the record discloses that both of the parties are graduates of Cornell University. The plaintiff attended law school during the first three years of the marriage and continuously practiced law in New York City thereafter. At the time of trial, the plaintiff was general counsel to Omnicom Group, Inc. After graduating from college, the defendant was employed in the financial industry in New York until 2003, and earned a substantial salary. In 2006 and 2007, she was engaged part-time in a recruiting business. She has been unemployed since 2008.

[4] In my view, the term "unallocated child support and alimony" has the potential to be confusing because it creates the impression that an award designated for child support has been made. Therefore, in this opinion, I refer to the court's order simply as "unallocated support." See *Tomlinson* v. *Tomlinson*, 119 Conn. App. 194, 211–12, 986 A.2d 1119 (2010) (award of unallocated support does not designate how support is to be apportioned or applied), rev'd on other grounds, 305 Conn. 539, 46 A.3d 112 (2012).

[5] The court ordered: "The plaintiff shall pay to the defendant, during his lifetime or until the defendant's death or remarriage, the following percentages of his gross annual earned income from employment, as hereinafter defined: a. [45] percent of the plaintiff's gross annual earned income from employment from October 1, 2009 until January 30, 2015, as unallocated alimony and child support; b. Commencing February 1, 2015, [40] percent

The court awarded the defendant exclusive use of the marital home in Greenwich until it is sold on or before April 1, 2014, and ordered that the parties immediately sell their vacation home in Salisbury. With few exceptions, the court ordered that the parties divide their assets, including the proceeds from the sale of the marital home, with 45 percent going to the plaintiff and 55 percent to the defendant. In addition, the court ordered the plaintiff to maintain health insurance for the benefit of each of the parties' children until they reach the age of eighteen and to maintain life insurance for the benefit of the parties' children and the defendant.

The parties filed numerous postjudgment motions. The court sustained the defendant's objection to the plaintiff's October 8, 2009 motion to reargue certain of the court's orders related to the definition of income, income tax disclosure, the marital and vacation homes, health insurance, life insurance and the country club membership.[6] On February 16, 2010, the plaintiff appealed from the judgment of dissolution, and the defendant thereafter filed a motion for appellate attorney's fees. The court granted the defendant's motion and ordered the plaintiff to pay the defendant $50,000 for attorney's fees. In April, 2010, the defendant filed a motion for clarification and correction concerning unallocated support, and several other matters not at issue in this appeal. The court issued a clarification and

of the plaintiff's gross annual earned income from employment through July 2, 2018, as unallocated alimony and child support; c. From July 2, 2018, until the death of either party or the defendant's remarriage, whichever shall first occur as defined by statute, [20] percent of the plaintiff's gross annual earned income from employment as alimony."

The court also ordered the parties to share the cost of their children's private school education. The court retained jurisdiction to enter additional education support orders pursuant to General Statutes § 46b-56c.

[6] In its judgment, the court ordered the plaintiff to transfer his membership in the Stanwich Country Club to the defendant. See *O'Brien* v. *O'Brien*, 138 Conn. App. 591, 592, 53 A.3d 283 (2012).

correction of its judgment on June 23, 2010. In response to an order of this court, the trial court, on December 3, 2010, articulated its decision with respect to the defendant's earning capacity, its award of appellate attorney's fees and the plaintiff's life insurance.

On appeal, the plaintiff claims, at times in caustic language, that he is entitled to a new trial on the basis of the court's financial orders, which he claims are contrary to the evidence, the court's factual findings and the law. Although the plaintiff has asserted numerous claims and arguments, his principal claim appears to be directed at the court's award of lifetime alimony to the defendant.[7] On the basis of my review of the record, the controlling statutes, the court's judgment and its subsequent memoranda of decision, I conclude that the court's financial awards do not constitute an abuse of discretion nor are they contrary to our law.[8]

"The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts.

[7] The plaintiff offers a litany of arguments and subarguments to support his claim. He contends that (1) there was undisputed evidence of the defendant's significant earning capacity, which the court acknowledged; (2) our law does not permit the court to ignore earning capacity in its alimony determinations; (3) there is no valid reason justifying the court's failure to impute some earning capacity to the defendant for the purposes of alimony determination; (4) the alimony component (a) increases over time, (b) serves no legitimate purpose, (c) provides no incentives to the defendant, (d) reflects outdated gender stereotypes (e) perpetuates the perception that alimony laws are applied differently based on gender, and (f) improperly uses gross earnings as the basis for the order; and (5) the court's broad definition of gross earnings (a) allows for double dipping and (b) is otherwise improper. I am not persuaded by these arguments.

[8] In his brief, the plaintiff acknowledges that the standard of review applied to financial orders in a dissolution action is the abuse of discretion standard. He contends, however, that the plenary standard should be applied in this case as the issues concern matters of statutory interpretation, the court's conclusions of law or mixed questions of law and fact. I do not agree.

. . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 87–88, 995 A.2d 1 (2010).

"As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did." (Internal quotation marks omitted.) *Gianetti* v. *Gerardi*, 122 Conn. App. 126, 129, 998 A.2d 807 (2010). "*[T]he question is not whether [the reviewing court], had [it] been sitting as the trial judge, would have exercised [its] discretion differently. Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives.*" (Emphasis added; internal quotation marks omitted.) *Skakel* v. *State*, 295 Conn. 447, 587–88, 991 A.2d 414 (2010) (*Palmer, J.*, dissenting).

I

The plaintiff claims that the court's "unallocated child support and alimony award" violates the principles underlying the child support guidelines (guidelines); Regs., Conn. State Agencies § 46b-215a-1 et seq.; and *Maturo* v. *Maturo*, supra, 296 Conn. 80.[9] Specifically,

---

[9] Child support in a dissolution of marriage action is controlled by General Statutes § 46b-84, which provides in relevant part: "(a) Upon . . . dissolution of any marriage . . . the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in

the plaintiff contends that the court did not comply with the guidelines by failing to state the needs and characteristics of the parties' children, basing its award on his gross rather than net earnings and ordering an award that exceeds the presumptive limit of 17.16 percent of net income.[10] The plaintiff's claim fails for several reasons. First, the guidelines pertain to *child support* awards only and not to awards of unallocated support, which is the situation in this case. Second, not only was *Maturo*[11] decided eight months after the dissolution judgment in this case was rendered, but it also is factually distinguishable.[12] Third, as I conclude in part II of this dissenting opinion, the court did not base its award on the plaintiff's gross earnings.

---

need of maintenance. . . ." For guidance in the awarding of child support, "[t]he legislature . . . has provided for a commission to oversee the establishment of child support guidelines . . . 'to ensure the appropriateness of child support awards . . . .' General Statutes § 46b-215a." *Maturo* v. *Maturo*, supra, 296 Conn. 90. "The . . . guidelines established pursuant to section 46b-215a and in effect on the date of the support determination shall be considered in all *determinations of child support amounts* . . . . In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support . . . to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the [commission] under section 46b-215a, shall be required in order to rebut the presumption in such case." (Emphasis added.) General Statutes § 46b-215b (a).

[10] The plaintiff also claims that in fashioning its support award, the court apparently did not give any consideration to the property division; see part II of this dissenting opinion; and custody schedule, based its award on an open-ended, uncapped percentage of his fluctuating income, failed to relate the award to the children's demonstrated need and failed to make the required finding of the amount of support indicated under the guidelines. In his reply brief, the plaintiff states "[t]he trial court here, *as best we can determine*, never consulted the [g]uidelines or [g]uidelines principles . . . ." (Emphasis added.) The plaintiff's statement is based on speculation. In any event, there was no reason for the court to consult the guidelines because its support order was unallocated.

[11] The relevant issue in *Maturo* was whether "the trial court improperly ordered [the husband] to pay 20 percent of his annual net cash bonus award as child support." *Maturo* v. *Maturo*, supra, 296 Conn. 88.

[12] The trial court rendered its judgment in this action on September 18, 2009. Our Supreme Court issued its decision in *Maturo* on May 4, 2010.

The following additional procedural history and facts are relevant to the plaintiff's claim. On April 22, 2009, the defendant filed proposed orders that included, among other things, that she receive unallocated support in accord with a proposed formula.[13] In his trial memorandum dated May 22, 2009, the plaintiff noted the differences between the parties' positions. He strenuously opposed an award of alimony to the defendant[14] and included a section in his brief on national trends regarding alimony. At the conclusion of evidence, counsel presented arguments to the court. The plaintiff stressed his opposition to alimony. Moreover, counsel's argument reflected that he was fully aware that child support

[13] The orders stated in relevant part: "The plaintiff shall pay to the defendant, during his lifetime, until the defendant's death or remarriage, the following percentages of his 'gross annual earned income from employment,' as hereinafter defined, as unallocated alimony and child support . . . .

"The plaintiff shall take no action for the purpose of defeating the defendant's timely right to receive unallocated alimony and child support and/or alimony and, in particular, shall take no action to reduce, divert, delay or defer income for the purpose of reducing, limiting or delaying the plaintiff's unallocated alimony and child support and/or alimony obligation to the defendant.

"In the event of the termination of the alimony payments hereof during the minority of the children, the parties shall determine the amount of child support to be paid by the plaintiff during his lifetime to the defendant for the support of each of the minor children and, in the event they are unable to agree, the amount of such child support payments shall be determined by a court of competent jurisdiction. Said amount shall be paid retroactive to the date of the termination of alimony."

The defendant subsequently filed amended proposed orders, but the quoted portions of the orders did not change.

[14] In his trial brief, the plaintiff contended that "the amount of alimony requested is extreme and outrageous and should be ignored. . . . [T]he suggested alimony structure presents tax problems that should be avoided. A separate child support order should be entered that is not intertwined with the alimony. If the court orders alimony despite the plaintiff's objection, despite the defendant's ability to support herself, it should be a separate order for a limited time period." He also stated, his "cash flow recommendation . . . is entirely focused on the children. If [the defendant] supports herself, he is offering to pay very high child support so very little will change in the lives of the children. Argument Chart #8 . . . shows the extreme generosity of [the plaintiff's] child support proposal. [The plaintiff] urges the court to accept this proposal that focuses on the children."

is taxable to the payor and that alimony is taxable to the payee and that any portion of a support award that is identifiable as child support is taxable to the payor.[15] In his posttrial argument concerning support, the plaintiff's counsel referred to the child support guidelines and stated that the plaintiff was willing to go beyond the requirements of the guidelines to support the children,[16] if the defendant was not awarded alimony. The court ordered the plaintiff to pay the defendant unallocated child support and alimony from October 1, 2009 until July 2, 2018. See footnote 5 of this dissenting opinion.

"Alimony and child support orders may either be allocated or unallocated. If allocated, some set amount is awarded for each purpose. If unallocated, the award of the amount to be paid periodically is not designated either as child support or alimony. Because it is unallocated, the benefit to the party charged with paying is that it is a deduction in its entirety for federal income tax purposes; see *Commissioner of Internal Revenue* v. *Lester*, 366 U.S. 299, 304, 81 S. Ct. 1343, 6 L. Ed. 2d

[15] The plaintiff's counsel stated, in part, during closing argument: "[W]e hope the court doesn't do anything with alimony, but if the court is going to do anything with alimony, we certainly urge the court, have alimony, have child support, have them separate. We all know what we're doing. We all know what the tax consequences of that. But this structure, with these ages of kids, with this many kids and this close bunched up causes tax problems that the computer programs can't figure out."

[16] Counsel for the plaintiff argued, in part, with respect to the guidelines as follows: "Now, what the guideline instructions say is what you're not supposed to do is what I'm about to do by way of example. You're not supposed to continue extrapolating from that number. But if one did, by way of example, in the next 200—so, if in the first 200, the percentage falls from forty to under twenty, in the next 200 the seventeen has to fall. It's actually a progression that would accelerate. It has to fall by at least 50 percent again. So, by the time you got out to a net of 400, the guideline amount would be something like 8 percent. [*The plaintiff*] *is willing to pay 35 percent.* It's eight times the extrapolation from the guideline, and you're not supposed to extrapolate from the guideline because extrapolating from the guideline produces too high of a number. *It's four times the highest guideline amount.*" (Emphasis added.)

306 (1961); whereas child support, if allocated, is not deductible." *Tomlinson* v. *Tomlinson*, 119 Conn. App. 194, 211–12, 986 A.2d 1119 (2010), rev'd on other grounds, 305 Conn. 539, 46 A.3d 112 (2012). "Even though an unallocated order incorporates alimony and child support without delineating specific amounts for each component, the unallocated order, along with other financial orders, necessarily includes a portion attributable to child support in an amount sufficient to satisfy the guidelines." *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 558, 46 A.3d 112 (2012). "[F]or income tax purposes an unallocated award of alimony and support is deductible by the [payor] and taxable to the [payee]." *Powers* v. *Powers*, 186 Conn. 8, 11, 438 A.2d 846 (1982). A trial court properly may consider the tax consequences of its award. Id., 10.

In this case, if the court had articulated findings pursuant to the guidelines, it may well have undercut the tax benefits afforded the parties by an award of unallocated support.[17] Given the argument of the plaintiff's

[17] "Alimony, if in compliance with the provisions of [Internal Revenue Code] § 71, is taxable to the payee and deductible to the payor pursuant to [Internal Revenue Code] § 215 . . . . Child support is not taxable/deductible. To qualify as taxable/deductible alimony, a stream of payments must be cash received by or on behalf of a spouse under a divorce . . . instrument which does not designate such payments as not taxable/deductible." M. Frumkes, "Unallocated Alimony and Child Support Can Be All Taxable/Deductible Alimony," 80 Fla. B.J., no. 6 (June 2006) p. 72. "Generally, whether a payment is alimony depends on [Internal Revenue Code §] 71 (b). Alimony and separate maintenance payments (collectively referred to as alimony) are taxable to the recipient and deductible by the payor. When a taxpayer makes support payments under a court order issued pending a divorce, the parties may specify the amount of alimony in a separation agreement. If neither a divorce decree nor a separation agreement exists, payments made under court orders that don't specifically allocate a portion of the amount as alimony or child support but rather as household maintenance may be deemed alimony if they meet the requirements in section 71 (b) (1)." C. Nash & T. Quinn, "Court Says Unallocated Support Payments Are Alimony," J. of Accountancy (Nov. 2003), available at www.journalofaccountancy.com/Issues/2003/Nov/CourtSaysUnallocatedSupportPaymentsAreAlimony (last visited October 1, 2012).

counsel at the conclusion of trial, he and the plaintiff were well aware of the tax benefits and implications of unallocated support. Pursuant to his final argument, the plaintiff was willing to forego the tax benefits to him and pay child support beyond the limits and percentages established by the child support regulations, if the court did not award the defendant alimony.

In *Tomlinson*, a case recently decided by our Supreme Court, the central issue was whether a non-modifiable order of unallocated support could be modified if the party having primary custody of the minor children changed; *Tomlinson* v. *Tomlinson*, supra, 305 Conn. 541; which is not the issue here. *Tomlinson*, however, provides guidance with respect to the question raised in this appeal, that is, whether when issuing an unallocated support order at the time of dissolution, the trial court must articulate findings pursuant to the guidelines. *Tomlinson* demonstrates that the answer is "no." See id., 558.

The *Tomlinson* dissolution judgment incorporated the parties' separation agreement. Id., 542. Pursuant to the agreement, primary physical custody of the parties' two minor children would be with the plaintiff wife. Id. The agreement also provided that the defendant husband would pay the plaintiff wife unallocated periodic support that was not modifiable in amount. Id., 542–43. Thereafter, the parties agreed that the defendant husband would have primary physical custody of the parties' children. Id., 543. The defendant husband "filed a motion to modify the [unallocated order], seeking a reduction in the amount of support he paid to the plaintiff [wife] on the ground that custody had changed." Id. The plaintiff wife opposed the motion on the ground that their separation agreement precluded modification. Id. The trial court granted the defendant husband's motion because there had been a change in

physical custody of the children and then determined what portion of the unallocated support was child support and deducted that amount from the amount the defendant husband owed the plaintiff wife as periodic alimony. Id., 544. The plaintiff wife appealed to this court, which reversed the judgment of the trial court on the basis of the nonmodifiable nature of the parties' agreement. *Tomlinson* v. *Tomlinson*, supra, 119 Conn. App. 212. The defendant husband appealed to our Supreme Court.

Our Supreme Court determined that the unallocated support could be altered due to a change in custody, noting "[e]ven though an unallocated order incorporates alimony and child support without delineating specific amounts for each component, the unallocated order, along with other financial orders, necessarily includes a portion attributable to child support in an amount sufficient to satisfy the guidelines." *Tomlinson* v. *Tomlinson*, supra, 305 Conn. 558. Although our Supreme Court agreed with the trial court that the support order could be modified and that the defendant husband was no longer required to pay the plaintiff wife periodic support that included child support, it remanded the matter to the trial court and provided the formula by which the court should determine the proper amount of child support. Our Supreme Court stated that "[g]iven that [t]he original decree [of dissolution] . . . is an adjudication by the trial court as to what is right and proper *at the time it is entered* . . . the trial court [on remand] must first determine what portion of the unallocated order represented the child support component at the time of the dissolution." (Citation omitted; emphasis in original.) Id., 558. In other words, at the time of the judgment dissolving the Tomlinson marriage, the trial court dissolving the marriage made no findings pursuant to the guidelines. Our Supreme Court determined that no such findings

had to be made until the time it affirmed the court's modification of the support award. I therefore conclude that in cases such as the one before this court now, when the court orders unallocated support, the court need not make the findings required by General Statutes § 46b-215b (a). In this case, no child support was ordered and, therefore, the guidelines do not apply.

With regard to the plaintiff's claim that the court's unallocated award violates *Maturo* v. *Maturo*, supra, 296 Conn. 80, that case is not applicable because the court here made no award of *child support*. In *Maturo*, our Supreme Court held that "the applicable statutes, as well as the guidelines, provide that *all* child support awards must be made in accordance with the principles established therein to ensure that such awards promote 'equity,' 'uniformity' and 'consistency' for children '*at all income levels*.' " (Emphasis in original.) Id., 94–95. Unlike the facts of *Maturo*, the court here made no child support order, *rather, it made an unallocated award of child support and alimony*. Moreover at oral argument after trial, the plaintiff's counsel argued that the plaintiff was willing to pay 35 percent of his applicable income for child support, which is more than the guidelines or *Maturo* requires. See footnote 16 of this dissenting opinion. "This court has stated on many occasions that a party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted). *Hall* v. *Bergman*, 106 Conn. App. 660, 672–73, 943 A.2d 515 (2008), aff'd, 296 Conn. 169, 994 A.2d 666 (2010).

Finally, *Maturo* was decided after the judgment of dissolution was rendered in this case, and, therefore, the court could not take its holding into consideration

even if it had awarded child support.[18] I conclude, therefore, that the court did not abuse is discretion in awarding the defendant unallocated support, and the plaintiff's claim regarding the guidelines fails. I now turn to the remainder of the plaintiff's claims on appeal.

## II

The plaintiff raises numerous additional claims related to his financial support obligations. He claims that it was improper for the court not to assign an earning capacity to the defendant. I disagree because the court was not required to determine the defendant's earning capacity and, in any event, a party's earning capacity is only one of the many factors to be considered by the court in making its financial awards.[19]

"It is well settled that [i]n dissolution proceedings, the court must fashion its financial orders in accordance with the criteria set forth in General Statutes §§ 46b-81 (division of marital property), 46b-82 (alimony) and

---

[18] With regard to its award of unallocated support, the court also ordered: "In the event of the termination of the alimony payments hereof during the minority of the children, the parties shall determine the amount of child support to be paid by the plaintiff during his lifetime to the defendant for the support of each of the minor children and, in the event they are unable to agree, the amount of such child support payments shall be determined by a court of competent jurisdiction. Said amount shall be paid retroactive to the date of the termination of alimony." If the plaintiff's obligation to pay alimony to the defendant ends while there are still minor children and the parties are unable to reach an agreement as to the amount of child support the plaintiff is obligated to pay and they turn to the court, the child support guidelines and *Maturo*, of course, would have to be considered. See *Tomlinson* v. *Tomlinson*, supra, 305 Conn. 558.

[19] The plaintiff also claims that the court's broad definition of gross earnings allows for "double dipping." I understand the claim to be that the court awarded the defendant certain moneys as a property settlement and also ordered the plaintiff to pay the defendant a percentage of those moneys again as unallocated support. I agree with the defendant's position that, although the same *type* of assets are referenced in both sections of the court's judgment of dissolution, the court did not award the defendant the same assets twice.

46b-84 (child support). All three statutory provisions require consideration of the parties' amount and sources of income in determining the appropriate division of property and size of any child support or alimony award. . . . [Section] 46b-82 provides in relevant part: In determining whether alimony should be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [§] 46b-81. . . . [Section] 46b-82 describes circumstances under which a court may award alimony. The court is to consider these factors in making an award of alimony, but it need not give each factor equal weight. . . . As long as the trial court considers all of these statutory criteria, it may exercise broad discretion in awarding alimony. . . . We note also that [t]he trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case. . . . There is no additional requirement that the court specifically state how it weighed the statutory criteria or explain in detail the importance assigned to each statutory factor." (Citations omitted; internal quotation marks omitted.) *Kaczynski* v. *Kaczynski*, 124 Conn. App. 204, 210–11, 3 A.3d 1034 (2010).

In this case, the court ordered the plaintiff, during his lifetime or until the defendant's death or remarriage, to pay the defendant a percentage of his gross annual earned income from employment. Generally, from the time of dissolution until July 2, 2018, the payments are for unallocated support, and beginning on July 2, 2018, the payments are for alimony. See footnote 5 of this dissenting opinion. In issuing its financial orders, the court stated that it had considered the criteria set forth

in §§ 46b-81 and 46b-82. The court found, in part, that the defendant "has been away from her career for some period, she will take little time in reacquiring her exceptional skills." "A judge is presumed to have performed [his] duty properly unless the contrary appears." (Internal quotation marks omitted.) *Miller* v. *Miller*, 22 Conn. App. 310, 314, 577 A.2d 297 (1990).

In its articulation, the court stated that "[a]t the time of the dissolution, the court found that the defendant was a stay-at-home mother and she served in that capacity at the plaintiff's request.[20] Obviously, after the children were grown, she would have earning capacity based on her education and prior abilities. It would be premature to assess earning capacity for some future date. Obviously, the defendant is well educated, earned large sums of money, and she has maintained her skills."[21]

---

[20] The plaintiff is correct when he points out that the court erred when it found that the plaintiff had requested that the defendant become a stay-at-home mother. The plaintiff testified that when the defendant decided to leave her employment at Credit Suisse, he "did not object." The defendant testified that she left Credit Suisse with the plaintiff's knowledge and consent.

The defendant testified in part on direct examination as follows:

"[The Defendant's Counsel]: Now, with regard, again [to] being a full-time mother, is there any significance to the ages of your children and your desire to be a full-time mother?

"[The Defendant]: Yes.

"[The Defendant's Counsel]: What significance?

"[The Defendant]: I have a teenager, a preteen and an eight year old. I think that period of time that spans later lower school to high school is critical. And . . . there's so many things academically, emotionally, physically that are changing, and I think it's critical to be there with the children. That was always our desire.

"[The Defendant's Counsel]: When you say it was—was this a decision—was this a plan that you had worked out with [the plaintiff]?

"[The Defendant]: Yes."

[21] At trial the plaintiff acknowledged that the defendant had been their children's primary caregiver at various times during their marriage, notably from 2003 when she left her employment until the time of trial. Pursuant to the parties' stipulated parenting plan, their minor children shall reside primarily with the defendant.

A

The plaintiff claims that the court's failure to assign an earning capacity to the defendant was error, as the evidence shows that she has a significant earning capacity and that our law does not permit a court to ignore earning capacity in its alimony determination. The court acknowledged the defendant's ability to earn significant sums of money prior to 2003 when she left her employment to assume the role of a stay-at-home mother. The court also recognized the defendant's talents and skills working in the financial markets. But the court concluded that she would need time to reacquire her exceptional skills. The court found that the defendant would have an earning capacity when the children were grown but that it would be premature to assign her an earning capacity at the time of dissolution. The record demonstrates clearly that the court considered the required statutory factors, including the defendant's ability to earn income. The plaintiff takes exception to the fact that, in view of the court's findings, the court did not assign an earning capacity to the defendant, who had been a stay-at-home mother during the last five years of the parties' marriage, a circumstance to which the plaintiff had acquiesced. On the basis of my review of the law, the record and the court's findings, I discern no abuse of the court's discretion.

The plaintiff cites language in Justice Healey's concurrence in *McPhee* v. *McPhee*, 186 Conn. 167, 440 A.2d 274 (1982), to support his claim that the court was required to assign an earning capacity to the defendant. I read Justice Healey's concurrence differently, and note his following statements: "I write separately to state my views on [the majority's] observation that the contrast between the defendant's recently acquired clerical position and the plaintiff's 25-year career as an aluminum siding contractor cannot support the trial court's finding that the employability of the parties is

equal. My view is that to so state, in effect, equates employability with earning capacity or earning potential; see *deCossy* v. *deCossy*, 172 Conn. 202, 205, 374 A.2d 182 (1977); or, more to the point, does not fully consider certain other factors in . . . §§ 46b-81 and 46b-82 that go to the present disparate incomes of the parties. . . .

"In construing a statute, no word should be treated as superfluous or insignificant . . . and words and phrases are to be construed according to the commonly approved usage of the language. . . . Webster defines employability as the quality or state of being employable and employable as capable of being employed, specif: physically and mentally capable of earning a wage at a regular job and available for hiring. . . . In my view, since both parties are in fact employed, the employability of both parties is equal. This is *one* factor to be considered under [§ 46b-82]. [E]arning potential has been said to be *one* of the important factors to be considered; see *deCossy* v. *deCossy*, supra, [172 Conn.] 205; and the statute has other terms going to that factor, i.e., vocational skills, occupation . . . health. Arguably, this list may not be exclusive, but the employability of a person is liminal to any meaningful determination of earning potential or earning capacity as that is explicated by other statutory terms. In any event, the majority opinion attenuates the distinction between employability and the other factors in §§ 46b-81 and 46b-82 referred to above." (Citations omitted; emphasis in original; internal quotation marks omitted.) *McPhee* v. *McPhee*, supra, 186 Conn. 178–79.

In this case, I agree that the defendant will be employable, but due to her responsibilities rearing the parties' children *at the time* of the trial and her time spent away from the financial industry, the court did not assign her an earning capacity, concluding that it was premature to do so. Moreover, one of the factors the court is to

consider under § 46b-82 (a) in the "case of a parent to whom the custody of minor children has been awarded, [is] the desirability of such parent's securing employment." The court's judgment indicates that the court properly considered the statutory requirements in view of the facts of this case. At the time of dissolution, the defendant was a stay-at-home mother, but the court implied in its articulation that she would obtain employment when the youngest of the parties' three children reaches the age of majority. That implication is supported by the level of alimony support the plaintiff is obligated to pay the defendant several months after the youngest child reaches the age of eighteen.

The plaintiff also seeks to bolster his position with language from *deCossy* v. *deCossy*, supra, 172 Conn. 205, a case with facts quite similar to those here.[22] The husband in *deCossy* appealed from the court's financial award. Id., 204. Although the trial court made no determination of the wife's earning capacity, it noted her skills. Our Supreme Court affirmed the judgment of the trial court, stating that "the [wife] was unemployed at the time of the award. She had previously been a teacher, but had not practiced her profession for many years. Though she planned to return to teaching, her earning potential, which was one of the important factors to be considered in awarding alimony under the

[22] Dissolution of the deCossy marriage was granted on the basis of the husband's wilful desertion of the defendant wife. *deCossy* v. *deCossy*, supra, 172 Conn. 203. After a hearing, the court "entered orders requiring the [husband] to pay $15,000 per year alimony, to pay $5000 per year child support for each of his three children, to provide medical insurance for the children, to provide term life insurance on his own life for the benefit of each minor child in the amount of $25,000 and insurance on his life in the amount of $50,000 payable to the [wife] until she dies or remarries, and to assume liability for and pay all obligations arising from the construction of the residence to be occupied by the [wife] and their children except that so long as the [husband] pays the alimony and child support the [wife] is to be responsible for paying the installments on the first mortgage. The [husband] was further ordered to pay $5000 in counsel fees." Id., 203–204.

provisions of General Statutes § 46-52 [now § 46b-82], was significantly lower than that of the [husband]. The court was required to consider the husband's income and his earning capacity. . . . The trial court found that in 1973 the [husband] had an income of $84,000 from his architectural partnership. Further, his firm, in which he was entitled to receive 60 percent of the profits, had contracted for architectural work within the next three years with a construction cost exceeding thirty-six million dollars." (Citations omitted.) Id., 205. Our Supreme Court held that the trial court acted within its discretion. Id., 204, 206. *deCossy* is an example of a trial court's properly considering the earning capacity of the parties, as the trial court did here. I do not read it to stand for the proposition, as the plaintiff asserts, that failure to assign an earning capacity to one of the parties is error.

The plaintiff has not identified a statute or decision that compels the court to determine an earning capacity for both parties when calculating child support or alimony. Compare *Chyung* v. *Chyung*, 86 Conn. App. 665, 675–76, 862 A.2d 374 (2004) (plaintiff failed to provide any statute, case law or rule of practice requiring court to specify exact earning capacity), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005). "Our jurisprudence requires the trial court to consider all the statutory criteria set forth in . . . § 46b-81 in determining how to distribute parties' assets in a dissolution action. . . . We do not, however, require that courts ritualistically recite the criteria they considered, nor are they bound to any specific formula respecting the weight to be accorded each factor." (Citation omitted.) *Casey* v. *Casey*, 82 Conn. App. 378, 384, 844 A.2d 250 (2004).

In addition, the plaintiff claims that the alimony component of its financial award is "riddled with error." He argues that the lifetime alimony award (1) increases over time in direct contradiction to the court's finding

that the defendant will take little time to reacquire her exceptional skills, (2) serves no legitimate purpose and provides the wrong incentive to the defendant, and (3) reflects outdated gender stereotypes and perpetuates the perception that alimony laws are applied differentially based on gender. I disagree with these claims and will address each of them briefly.

As to the claim that the court erred by ordering lifetime alimony that increases over time, the plaintiff ignores the fact that the court's order is for *unallocated* support until July 2, 2018. See footnote 5 of this dissenting opinion. If the award is unallocated, "the award of the amount to be paid periodically is not designated either as child support or alimony." *Tomlinson* v. *Tomlinson*, supra, 119 Conn. App. 211. I therefore reject the plaintiff's claim.

The plaintiff next asserts that lifetime alimony serves no purpose and is a disincentive to the defendant's obtaining employment. He also suggests that he is being punished by having to pay the defendant alimony until his or her death or her remarriage. He also reasserts his claim that the defendant has a demonstrated earning capacity. Regardless of those arguments, there is nothing inappropriate about a lifetime award of alimony, if the court, in the exercise of its discretion, after considering all of the statutory factors, believes that it is warranted. My review of the record discloses that the court considered the factors as required by § 46b-82. A dissolution court may place varying degrees of importance on each of the statutory factors according to the circumstances of each case. See *Ippolito* v. *Ippolito*, 28 Conn. App. 745, 751, 612 A.2d 131, cert. denied, 224 Conn. 905, 615 A.2d 1047 (1992). A court properly may award lifetime alimony even when the recipient has an earning capacity. See *McMellon* v. *McMellon*, 116 Conn. App. 393, 396, 976 A.2d 1, cert. denied, 293 Conn. 926, 980 A.2d 911 (2009). Moreover, "alimony is not designed to

punish, but to ensure that the former spouse receives adequate support." *Cleary* v. *Cleary*, 103 Conn. App. 798, 807, 930 A.2d 811 (2007). When the court here articulated the factual basis for its order making the defendant the beneficiary of $9 million in life insurance for the duration of her life assuming that she does not remarry, the court stated that it had "considered the parties' lifestyle during the marriage and the necessity of protecting the wife for the rest of her life." The court's alimony award therefore is intended to provide the defendant with adequate support as is permitted by law.[23]

In accordance with the discretionary standard of review, the issue is not whether I, as the reviewing court, would have exercised my discretion differently, but whether the trial court chose one of a number of reasonable alternatives. See *Marquand* v. *Administrator, Unemployment Compensation Act*, 124 Conn. App. 75, 79–80, 3 A.3d 172 (2010), cert. denied, 300 Conn. 923, 15 A.3d 630 (2011). Unlike the trial court, I did not have the opportunity to view the parties and make credibility determinations. See *Crotty* v. *Tuccio Development, Inc.*, 119 Conn. App. 775, 779, 990 A.2d 888 (2010). Under the circumstances of this case, while another judge might have approached this issue differently, I can discern no abuse of discretion in the court's failing to assign the defendant an earning capacity at the time of dissolution.

B

The plaintiff further claims in his statement of the issues and in this argument that the court improperly

---

[23] The plaintiff also claims that the award of lifetime alimony reflects outdated gender stereotypes and the perception that dissolution laws are applied differently on the basis of gender. There is no record that these claims were raised in the trial court. I therefore decline to review them. See *Adamo* v. *Adamo*, 123 Conn. App. 38, 46, 1 A.3d 221, cert. denied, 298 Conn. 916, 4 A.3d 830 (2010).

used his gross earnings as a basis for its award of unallocated support.[24] I disagree with the premise of the plaintiff's claim and therefore reject it.

In its memorandum of decision issued on September 18, 2009, the court stated: "The court has carefully considered all of the criteria set forth in §§ 46b-81 and 46b-82 . . . in entering its orders. It has also considered the assets and liabilities of the parties as well as their gross and *net income*[s]." (Emphasis added.) In its articulation, the court stated that as "of April 21, 2009, according to the plaintiff's affidavit, he has gross earnings and gross income of $17,414 per week gross which resulted in a *net* [income] of $10,900 per week." (Emphasis added.) In light of this explicit language, the plaintiff's assertion in his brief that the court's memorandum of decision "reflects no awareness or consideration of net earnings or *net income*" is somewhat confounding. (Emphasis added.)

---

[24] The court defined gross annual earned income from employment as follows: " '[G]ross annual earned income from employment' shall be broadly defined to include any and all earnings of any nature whatsoever actually received by the plaintiff, or which the plaintiff is entitled to receive, from any and all sources relating to services rendered by the husband by way of his past, current or future employment, including but not limited to salary, bonus, incentive compensation, exercisable stock options, stock grants, restricted stock awards, grants and/or units, warrants, stock awards and option awards granted but not accepted, stock grants and option grants awarded but deferred, dividends on stock awards and option awards, contract payments, stock appreciation rights, performance share awards, performance stock units, dividend equivalents, stock payments, deferred stock, qualified performance based compensation, commission payments, severance payments, profit participations/distributions and voluntary payments made to qualified and nonqualified retirement plans for his benefit both paid and/or deferred. Upon vesting of any stock and/or options, the plaintiff shall immediately notify the defendant. The plaintiff shall, as soon as practical when notified by the defendant in writing, exercise her share of the stock and/or options and sell the resulting stock and deliver to her the proceeds of the sale of the stock within five . . . business days, net of all costs of exercise and sale, including federal and state taxes which he is required to pay as the legal owner of the stock and/or options.

"Deferred income or compensation that the plaintiff has no control over shall not be considered as part of the plaintiff's 'gross annual earned income

"It is well settled that a court must base its child support and alimony orders on the available net income of the parties, not gross income. . . . Whether or not an order falls within this prescription must be analyzed on a case-by-case basis. Thus, while our decisional law in this regard consistently affirms the basic tenet that support and alimony orders must be based on net income, the proper application of this principle is context specific. . . . [T]he fact that the alimony and support order was ultimately a function of gross income does not, alone, stand for the proposition that the order was based on gross income. . . . [W]e differentiate between an order that is a function of gross income and one that is based on gross income." (Citation omitted; internal quotation marks omitted.) *Auerbach* v. *Auerbach*, 113 Conn. App. 318, 338, 966 A.2d 292, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009).

The plaintiff relies on *Morris* v. *Morris*, 262 Conn. 299, 811 A.2d 1283 (2003), to support his claim. In *Morris*, the trial court stated that it "needs to decide what the respective parties have available for support consideration now." (Internal quotation marks omitted.) Id., 306. The trial court then found that the husband has " 'the following *gross* amounts' " and the wife's " '[gross] income is . . . .' " (Emphasis in original.) Id. In the case before us, the trial court found the plaintiff's gross income *and* his net income and stated that it considered both in making its award. "[W]e do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary." (Internal quotation marks omitted.) *State* v. *Baker*, 50 Conn. App. 268, 275 n.5, 718 A.2d 450, cert. denied, 247 Conn. 937, 722 A.2d 1216

from employment' until said deferred income or compensation is actually received, or capable of being received by the [plaintiff] and is taxed as income."

(1998). In consideration of the full record, I cannot conclude that the court predicated its unallocated support award on the plaintiff's gross income.

For the foregoing reasons, I conclude that the court did not abuse its discretion by failing to assign the defendant an earning capacity or that its financial orders are based on the plaintiff's gross earnings.

### III

The plaintiff's third claim is that the court abused its discretion by requiring him to maintain $9 million of life insurance as long as his lifetime alimony obligation exists.[25] I disagree.

The following facts are relevant to this claim. In its memorandum of decision, the court ordered that, as long as the plaintiff is obligated to pay alimony, child support or educational support, "the April 20, 1998 Michael J. O'Brien Family Insurance Trust shall remain in full force and effect and the plaintiff shall be required to provide sufficient funds to the trust on a timely basis for the purpose of paying the premiums for the life insurance policies in which the trust is the beneficiary. For as long as the plaintiff has an obligation to pay alimony, the beneficiary of the [t]rust shall be the defendant. In the event that the plaintiff's obligation to pay alimony to the defendant terminates, the beneficiary of the trust shall be the parties' children. The remaining life insurance policies with death benefits of [$8 million] shall remain unchanged. . . . The defendant shall remain the beneficiary of the existing Omnicom Group Life Insurance Policy with a current face value of [$1

---

[25] In his brief the plaintiff stated that the court ordered him to maintain $9 million in mostly term life insurance for the remainder of his life. The statement needs amplification. The court ordered him to maintain the life insurance as long as he had an obligation to pay child, educational or alimony support. Significantly, the plaintiff does not challenge the *amount* of life insurance he is required to maintain for the benefit of his children.

million], or any successor policy up to [$1 million] face value for as long as the plaintiff has an alimony and/or child support and/or educational support obligation."

In October, 2010, in response to the plaintiff's motion for review, this court ordered the trial court to articulate several portions of its dissolution judgment, including its order related to life insurance.[26] The court articulated its decision in accordance with the articulation order; see footnote 26 of this dissenting opinion; as follows: "3. The court considered the cost to the plaintiff of life insurance premiums based on his earnings at the time of judgment as well as his assets and future earnings. 4. It was not intended that the cash value of life insurance policies in the O'Brien Family Trust be used to pay premiums thereon. 5. It was intended that its order concerning life insurance policies apply for the life of the term policies. 6. The court was referring to the [$8 million] life insurance in the O'Brien Family Trust. 7. The court considered the parties' lifestyle during the marriage and the necessity of protecting the wife for the rest of her life."

The factual basis of the plaintiff's claim is that the premiums for term life insurance increase after a period

---

[26] This court ordered the trial court to articulate: "(3) whether it considered the cost to the [plaintiff], going forward, of paying the life insurance premiums as ordered by the court, and, if so, what was the court's evidentiary basis for determining that he could afford those premiums 'for the remainder of [the defendant's] life,' if she did not remarry, (4) whether it intended that the cash value of the life insurance policies in the Michael J. O'Brien Family Trust be available to pay the premiums of those policies, (5) whether it intended that its order concerning the life insurance policies apply only for the life of the term policies, or whether the [plaintiff] is required to purchase new or replacement policies as the term policies end, (6) to what life insurance policies was the court referring when, after discussing the $8 million in life insurance in the Michael J. O'Brien Family Trust, it stated that 'the remaining life insurance policies with death benefits of [$8 million] . . . shall remain unchanged,' and (7) its 'logical and factual basis' for awarding the [defendant] up to [$9 million] in life insurance for the remainder of her life, assuming she does not remarry."

of time. In a footnote in his brief to this court, he points out that the premiums for a John Hancock term policy for $3 million issued in 1998 remain flat for only fifteen years and that the premiums will increase in 2012. While this may be so, the defendant contends that the plaintiff failed to present evidence of an increase to the trial court. The only evidence of the cost of insurance I could find in the record is the then present cost of the plaintiff's insurance in existence at the time of trial. The plaintiff has not brought to the attention of this court an indication that he offered evidence as to the future cost of life insurance.

"An order for life insurance is very often an appropriate and necessary component of a judgment of dissolution of marriage. . . . Indeed, orders requiring the maintenance of life insurance have been approved on numerous occasions by our courts. . . . [Section] 46b-82 (a) and 46b-84 (f) were amended in 2003 to provide: The court may order that a party obtain life insurance as such security unless such party proves, by a preponderance of the evidence, that such insurance is not available to such party, such party is unable to pay the cost of such insurance or such party is uninsurable. . . . These amendments place the burden regarding the availability and cost of the life insurance on the party upon whom the life insurance obligation is to be imposed." (Citation omitted; internal quotation marks omitted.) *Boyne* v. *Boyne*, 112 Conn. App. 279, 285–86, 962 A.2d 818 (2009).

The plaintiff also argued that there was no basis in fact for the court to order him to maintain $9 million worth of insurance. The court stated in its articulation that it had "considered the parties' lifestyle during the marriage and the necessity of protecting the [defendant] for the rest of her life." The plaintiff acknowledges that ordering security for financial awards falls within the court's discretion, but he argues that that discretion "is

not without limits." *Parley* v. *Parley*, 72 Conn. App. 742, 746, 807 A.2d 982 (2002). In *Parley*, the trial court ordered the husband to obtain additional life insurance to secure his financial obligation without determining whether such insurance was available and its costs. Id. *Parley* is distinguishable from this case, in which the plaintiff already had procured the insurance.

On the basis of a review of the record, the court's memorandum of decision and its articulation, I conclude that the court did not abuse its discretion by ordering the plaintiff to maintain $9 million in life insurance as long as he has an obligation to provide child, education or alimony support. The plaintiff's prior conduct provides an appropriate basis for the amount of the order. In 1998, the plaintiff established a trust funded with more than $4 million of life insurance and, by the time of trial, it had been funded with more than $8 million of life insurance. That amount of security may be construed as, roughly speaking, what the plaintiff thought his family would need if he were to suffer an untimely death. It was not unreasonable for the court to adopt that amount to secure its financial awards. Moreover, at the time of dissolution, all of the parties' children were being educated in independent schools, and the court retained jurisdiction to enter additional educational support orders in accordance with General Statutes § 46b-56c.

The court's award also finds support in our case law. In *Eldridge* v. *Eldridge*, 4 Conn. App. 489, 492, 495 A.2d 283 (1985), the husband claimed that the trial court had "erred in ordering security for payments 'far' in excess of the amount of the maximum future support for which he could be liable." In its articulation, the trial court stated that "the order regarding life insurance was intended to 'protect' the awards of periodic alimony and [child] support." Id., 493. On appeal, this court concluded that when the husband's "maximum possible

obligation to the children *and* the [wife] is considered, the order was not excessive." (Emphasis in original.) Id. The same reasoning is applicable in the present case. The court ordered the plaintiff to maintain life insurance to protect its financial awards. Considering the plaintiff's maximum possible obligation, I conclude that the court did not abuse its discretion, particularly in light of the fact that the plaintiff himself set the disputed amount when he established and funded the Michael J. O'Brien Family Trust. For the foregoing reasons, I reject the plaintiff's claim regarding the court's life insurance order.

## IV

The plaintiff's fourth claim is that the court improperly awarded the defendant attorney's fees to defend this appeal. I disagree.

On February 25, 2010, the defendant filed a motion for counsel's fees postjudgment. In her motion, the defendant set forth the postjudgment motions that had been filed by the plaintiff, her objections thereto and the court's rulings. She also stated that the plaintiff had filed an appeal and that he has control over the majority of the parties' assets. The defendant represented that she was without sufficient funds to defend the appeal and to prosecute or defend pending postjudgment motions, and she requested funds for that purpose. The motion was heard by the court in June, 2010, at which time the defendant's counsel presented an affidavit containing a statement of services rendered and disbursements from September 23, 2009 through June 21, 2010. To date the defendant had incurred expenses totaling $39,166.58 and anticipated additional legal expenses of $25,000.[27] On July 2, 2010, the court ordered that the "plaintiff shall pay the defendant $50,000 within thirty

---

[27] In the trial court and on appeal, the plaintiff does not claim that the amount of the attorney's fees is unreasonable.

days toward her attorney['s] fees and costs." In response to this court's order to articulate the basis of its award, the court stated "[t]he defendant is defending an appeal that is frivolous. To not award her attorney['s] fees to defend could undermine other awards."

"Section 46b-62 vests in the trial court the discretion to award attorney's fees. Our Supreme Court has included within the definition of attorney's fees allowable under § 46b-62 certain costs of litigation . . . . The criteria to be considered in determining whether an award of attorney's fees is appropriate [are set forth in § 46b-82 and] include the age, health, station, occupation, amount and sources of income, vocational skills, employability [and] estate and needs of each of the parties . . . . We review the court's awarding of attorney's fees under the abuse of discretion standard. . . . The ultimate issue in our review, therefore, is whether the court reasonably could have concluded as it did. . . . Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of . . . her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . An exception to th[is] rule . . . is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine [the court's] prior financial orders . . . ." (Citation omitted; internal quotation marks omitted.) *Adamo* v. *Adamo*, 123 Conn. App. 38, 53, 1 A.3d 221, cert. denied, 296 Conn. 916, 4 A.3d 830 (2010). The court "has the discretion to award counsel fees to a party in a dissolution action in accordance with their respective financial abilities and the criteria set forth in [§] 46b-82, including length of the marriage [and] causes for the dissolution of the marriage . . . ." (Internal quotation marks omitted.)

*O'Neill* v. *O'Neill,* 13 Conn. App. 300, 305, 536 A.2d 978, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988).

In this case, the court awarded the defendant attorney's fees to prosecute and defend postjudgment motions and the plaintiff's appeal, concluding that "[t]o not award her attorney['s] fees to defend could undermine other awards." The court's ruling is in keeping with the exception articulated in *Adamo.* The court's findings "do not have to be explicit as long as the record would support a finding that the party to whom the award of attorney's fees is made lacks sufficient liquid assets with which to pay his or her attorney's fees or that the failure to award such fees would undermine the court's other financial orders." *Bee* v. *Bee,* 79 Conn. App. 783, 791, 831 A.2d 833, cert. denied, 266 Conn. 932, 837 A.2d 805 (2003); see also *Bornemann* v. *Bornemann,* 245 Conn. 508, 542, 752 A.2d 978 (1998).

The record supports the court's award of attorney's fees to preserve its financial orders. At the time of the appeal, the defendant was a stay-at-home mother. The financial affidavits of the parties showed that the plaintiff had an annual net income of approximately $567,000, excluding noncash compensation, and assets of appoximately $4 million, excluding unvested stock options. The defendant had an annual net income from dividends and interest of $11,784 and assets of $2.15 million, including her one-half share of the parties' two houses. I conclude that the court did not abuse its discretion by awarding the defendant attorney's fees to defend this appeal.

V

The plaintiff's fifth claim is that the court improperly modified its judgment in a material way nine months after the judgment was issued when it ruled on the

defendant's motion for clarification and correction.[28] I would dismiss the claim for lack of aggrievement.

In its memorandum of decision dated September 18, 2009, the court ordered the plaintiff to pay the defendant support in the following fashion: (1) 45 percent of his gross annual earned income from employment as unallocated support from October 1, 2009 until January 30, 2015, (2) 40 percent of his gross annual income from employment as unallocated support from February 1, 2015 through July 2, *2024*, (3) 20 percent of his gross annual earned income from employment as alimony from July 2, *2024*, until the death of either party or the defendant's remarriage, whichever occurs first.

On April 15, 2010, the defendant filed a motion for clarification and correction, postjudgment. The defendant asked the court, among other things, to clarify whether "[s]tarting the month after the parties' youngest child turns eighteen, i.e., beginning June 1, 2018, the [40] percent of 'gross annual earned income from employment' paid to the defendant by the plaintiff through July 2, 2024, is paid as alimony, rather than 'unallocated alimony and support.' " The court issued a clarification on June 23, 2010, stating in relevant part: "b. Commencing February 1, 2015, [40] percent of the plaintiff's gross annual earned income from employment through July 2, *2018* as unallocated alimony and child support; c. From July 2, *2018*, until the death of either party or the defendant's remarriage, whichever shall first occur as defined by statute, [20] percent of

---

[28] "[A] motion for clarification is an appropriate procedural vehicle to ensure that the original judgment is properly effectuated. . . . Motions for clarification may not, however, be used to modify or to alter the substantive terms of a prior judgment . . . and we look to the substance of the relief sought by the motion rather than the form to determine whether a motion is properly characterized as one seeking a clarification or a modification." (Internal quotation marks omitted.) *Von Kohorn* v. *Von Kohorn*, 132 Conn. App. 709, 714, 33 A.3d 809 (2011).

the plaintiff's gross annual earned income from employment as alimony." (Emphasis added; internal quotation marks omitted.)

On appeal, the plaintiff claims that the court impermissibly modified its judgment by amending the year in which his unallocated support payment of 40 percent of his gross income ends and he is to begin paying 20 percent of his gross income as alimony.[29] "[T]he construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as that which is expressed." (Internal quotation marks omitted.) *de Repentigny* v. *de Repentigny*, 121 Conn. App. 451, 462–63, 995 A.2d 117 (2010).

The plaintiff argues that the motion for clarification was not predicated on the modification criteria of General Statutes § 46b-86[30] and that a court lacks jurisdiction to open a judgment to correct it more than four months after the judgment was rendered. Our Supreme Court has noted that "[m]otions for interpretation or clarification, although not specifically described in the rules of practice, are commonly considered by trial

[29] The plaintiff asserts that his claim is supported by this court's recent decision in *Von Kohorn* v. *Von Kohorn*, supra, 132 Conn. App. 709. That case is factually distinct from this case. In *Von Kohorn*, the trial court's order in response to a motion for clarification went beyond the clarification requested. Id., 711–12, 716. In this case, the court limited its order to the specific request in the motion for clarification, i.e., the year in which the plaintiff was to pay the defendant 20 percent of his gross earned income from employment as alimony.

[30] General Statutes § 46b-86 is entitled "Modification of alimony or support orders and judgments."

courts and are procedurally proper. . . . There is no time restriction imposed on the filing of a motion for clarification. . . . [S]ee . . . *Sablosky* v. *Sablosky*, 258 Conn. 713, 720, 784 A.2d 890 (2001) (where there is an ambiguous term in a judgment, a party must seek a clarification); id., 722 (it is incumbent upon the parties to seek judicial resolution of any ambiguity in the language of judgments)." (Citation omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 244–45, 796 A.2d 1164 (2002). The policy of allowing a party to seek clarification of an ambiguous judgment is "grounded in the trial court's equitable authority to protect the integrity of its judgments." Id., 246. Contrary to the plaintiff's position here, the court's authority to clarify its judgment is not grounded in § 46b-86. Id.

Our Supreme Court has stated that a court has an "interest in preserving the integrity of its judgments. Specifically, this court previously has recognized that it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Rocque* v. *Light Sources, Inc.*, 275 Conn. 420, 433, 881 A.2d 230 (2005). "A court's continuing jurisdiction derives from these equitable powers." Id. I conclude that the court recognized the ambiguity presented by the year 2024, as it was not related to the time the parties' youngest child turned eighteen. It appears that the year 2024 in the court's September 18, 2009 memorandum of decision was an error. A court has the authority to correct an error in its judgment. See *Dougherty* v. *Dougherty*, 109 Conn. App. 33, 38–39, 950 A.2d 592 (2008).

Moreover, by correcting the year in which the plaintiff's obligation to pay 40 percent of his gross annual earned income ended, i.e., from 2024 to 2018, and his obligation to pay 20 percent of his gross annual earned

income began, the court reduced the plaintiff's obligation to pay 40 percent of his income to the defendant by six years. The plaintiff therefore is not aggrieved by the court's correction. See General Statutes § 52-263.[31] A "party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific, personal and legal interest has been specially and injuriously affected by the decision . . . ." (Internal quotation marks omitted.) *Med-Trans of Connecticut, Inc.* v. *Dept. of Public Health & Addiction Services,* 242 Conn. 152, 158–59, 699 A.2d 142 (1997). The court's clarification benefitted the plaintiff. He therefore is not aggrieved, and I would dismiss the claim.

Respectfully, for the foregoing reasons, I would dismiss the plaintiff's claim concerning modification of the judgment and affirm the judgment in all other respects.

---

[31] General Statutes § 52-263 provides the right of appeal if "either party is *aggrieved* by the decision of the court or judge upon any question or questions . . . arising in the trial . . . ." (Emphasis added.) See also Practice Book § 61-1.