******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL J. O'BRIEN *v.* KATHLEEN E. O'BRIEN
(AC 36694)

Beach, Prescott and Bear, Js.

*Argued September 25—officially released December 1, 2015*

(Appeal from Superior Court, judicial district Fairfield, Hon. Howard T. Owens, Jr., judge trial referee [dissolution judgment]; Pinkus, J. [financial orders].)

*Daniel J. Klau*, for the appellant (plaintiff).

*George J. Markley*, with whom was *Aidan R. Welsh*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. The plaintiff, Michael J. O'Brien, whose marriage to the defendant, Kathleen E. O'Brien, was dissolved in September, 2009, appeals, challenging the new financial orders rendered by the trial court on remand following his prior appeal from the judgment of dissolution. See *O'Brien* v. *O'Brien*, 138 Conn. App. 544, 557, 53 A.3d 1039 (2012) (reversing dissolution judgment only as to financial orders and remanding for new trial on all financial issues), cert. denied, 308 Conn. 937, 66 A.3d 500 (2013). The dispositive issue raised by the plaintiff in the present appeal is whether, after remand, the court improperly skewed its equitable distribution of marital assets in favor of the defendant on the ground that the plaintiff had engaged in certain financial transactions, both prior to the dissolution judgment and while the appeal from that judgment was pending, that violated the automatic orders applicable in all marital dissolution actions. See Practice Book § 25-5.[1] Even if we assume without deciding that the court correctly found that the plaintiff's financial transactions amounted to technical violations of the automatic orders, we conclude that in the absence of some additional finding by the court that the plaintiff's actions were contumacious or were conducted with an intent to hide or to dissipate marital assets, the court improperly "took into account" the plaintiff's financial transactions and, for that reason, reduced the plaintiff's share of the property distribution. Accordingly, we reverse the judgment of the trial court and remand the matter for a new hearing on all financial orders.[2]

The following facts, which either were found by the court in its memorandum of decision or are undisputed in the record, and procedural history are relevant to our consideration of the issues raised on appeal. The plaintiff and the defendant were married in 1985. They had three children born of the marriage. At the time of the dissolution judgment in 2009, the children were nine, thirteen, and fifteen years old. Both parties are well educated, each having graduated with a degree from Cornell University. After the parties were married, the plaintiff also earned a law degree.

The plaintiff currently is employed as senior vice president, general counsel, and secretary of Omnicom Group, Inc. (Omnicom), a Fortune 200 company. Prior to that position, he worked as an attorney for several New York law firms. The plaintiff's base salary with Omnicom is $700,000 a year, but his compensation package also includes a variable annual cash bonus as well as a noncash component, which, in the past, has consisted of some form of company stock or stock options. Since 2004, the plaintiff's total yearly cash earnings averaged more than $1.2 million.

Prior to 2003, the defendant had a successful career

in banking; her last position was as a managing director for Credit Suisse, where she earned more than $1 million a year. She left that career, however, in 2003, to devote her time to raising the parties' children. She returned to work in 2007, as an executive recruiter, but left that position in 2008. Later, in 2013, the defendant participated in a three month returnship program offered by JP Morgan Chase. On the basis of her earnings from the returnship program, the defendant has a present annual earning capacity of $143,000.

Money was never an issue for the parties until the dissolution action was commenced. Since 2001, they lived in a large home in Greenwich, where they often entertained. They frequently traveled with the children, who have attended private schools.

The plaintiff commenced the present action seeking dissolution of the parties' marriage in January, 2008.[3] Service of the complaint included service of notice of the automatic orders in accordance with Practice Book §§ 25-2 and 25-5.

On February 12, 2009, several months prior to the dissolution trial, the plaintiff sold 28,127 shares of Omnicom stock, which represented all of the vested shares he held as of that date. The plaintiff was worried about the volatility of the stock market at that time in light of the stock market crash of October, 2008, and the ongoing global financial crisis, and believed it was in the best interest of the parties' financial well-being to sell the stock immediately to preserve assets. The sale price was $27.451 per share and resulted in cash proceeds of $772,140. All proceeds from the stock sale were placed in a Merrill Lynch account. The plaintiff disclosed the stock sale to the defendant by reflecting the change on his financial affidavit dated April 21, 2009. The plaintiff did not obtain the defendant's written consent prior to selling the stock, nor did he seek permission to do so from a judicial authority. Prior to the dissolution trial, the defendant did not file a motion for contempt claiming that the stock sale violated the automatic orders.

Several months later, the dissolution action was tried to the court, *Hon. Howard T. Owens, Jr.*, judge trial referee. On September 18, 2009, the court rendered judgment dissolving the parties' marriage. As part of the orders issued in conjunction with the dissolution judgment, the court effectively awarded 45 percent of all marital assets to the plaintiff and 55 percent to the defendant, which included future proceeds from the court's ordered sale of the parties' marital home and lake house as well as "all vested and unvested stock and stock options . . . ."[4] The court made no mention of the plaintiff's predissolution sale of stock in its decision; the Merrill Lynch account containing the proceeds from that sale of stock was subject to the overall 45/ 55 percent split. During the pendency of the first appeal,

the court lifted the appellate stay with respect to the Merrill Lynch account containing the proceeds from the stock sale, and funds were disbursed to the parties in accordance with a stipulated agreement.

The plaintiff appealed from the judgment of dissolution, challenging the court's unallocated alimony and child support award, as well as certain other aspects of the court's financial orders.[5] The plaintiff did not challenge the property division orders. While that appeal was pending, the plaintiff, on two separate occasions, exercised a total of 75,000 stock options that had vested during the pendency of the appeal, immediately converting the resulting shares of stock into cash.[6] The plaintiff had received the 75,000 unvested Omnicom stock options in March, 2009, during the pendency of the dissolution action, as part of his noncash compensation; 22,500 of those shares vested in October, 2010, and resulted in cash proceeds of $445,000. The remaining 52,500 shares vested in October, 2012, generating $1,345,050 in cash. On neither occasion did the plaintiff obtain the consent of the defendant or seek permission from any judicial authority prior to initiating the stock option transactions. The plaintiff fully preserved all proceeds from each of the stock option transactions in a Fidelity account.

This court issued its decision in the first appeal on October 16, 2012, reversing the judgment of dissolution only as to the trial court's financial orders. See *O'Brien* v. *O'Brien*, supra, 138 Conn. App. 557. We concluded that the court improperly had issued an unallocated award of alimony and child support without first considering and applying the child support guidelines; id., 555; and remanded the matter for a new trial on all financial issues. Id., 557.

On remand, the matter was tried before the court, *Pinkus, J.*, over five days between February 10 and 19, 2014. On February 10, 2014, the defendant filed a motion for contempt in which she argued that the plaintiff's predissolution sale of stock and his postdissolution exercise of stock options violated the automatic orders. The defendant asked the court to adjudicate the plaintiff in contempt, to order the plaintiff to pay all legal fees and costs incurred in connection with the motion, and to award any other relief that the court deemed appropriate.

During the trial before Judge Pinkus, the defendant elicited testimony from an accounting expert, Mark Harrison, who opined that, had the plaintiff not sold the 28,127 shares of stock for $772,140 prior to the first dissolution trial, those same shares of stock would have been worth $2,140,465 on February 18, 2014, the date the expert testified at the retrial. The expert also testified that had the plaintiff not exercised his stock options in the manner that he did, netting a combined $1,790,050, those stock options would have been valued

at $3,952,500 on February 18, 2014. Thus, the defendant sought to establish through her expert that the plaintiff's financial transactions, which the defendant asserted were made in violation of the automatic orders, resulted in a net loss to the marital estate of more than $3.5 million if valued at the date of the retrial.

In a written memorandum of decision, the court stated that, in crafting its financial orders, it had considered all relevant statutory criteria and that it had valued all marital assets as of the date of dissolution.[7] The court noted that the parties had filed a stipulation dated February 18, 2014, in which the parties had assigned values for most of the marital assets as of the date of dissolution, and the court incorporated that stipulation by reference. The court further indicated that if any asset had no current value but had a value at the time of dissolution, the court took that fact "into account" in rendering its financial orders.

Turning specifically to the issue of the plaintiff's predissolution sale of stock and his postdissolution exercise of stock options, the court first indicated that those transactions resulted in "a significant loss to the marital estate." The court next found that the transactions "did in fact violate the automatic orders." The court, however, continued: "The plaintiff testified that he was acting on advice of counsel. As a result, he is *not found to be in contempt*; however, the court has *taken into account these transactions in making its awards*." (Emphasis added.)

Following that statement, the court set forth its financial orders. With respect to alimony and child support, the court ordered the plaintiff to pay the defendant $1248 per week in child support, retroactive to September 18, 2009, and subject to adjustment once the plaintiff became obligated to pay child support for only one child. The court also made alimony retroactive to September 18, 2009, ordering the plaintiff to pay the defendant $45,000 per month for the first seven years, at which time payments would reduce to $37,500 per month for the next seven years, followed by an additional seven year period at $25,000 per month.[8] Finally, the court issued orders dividing the marital assets, including all assets identified and valued by the parties in their February 18, 2004 stipulation.[9] This appeal followed.

On May 6, 2014, the plaintiff filed a motion for articulation pursuant to Practice Book § 66-5. In his motion, the plaintiff asked the court, inter alia, to state "[t]he manner in which the court 'took into account' the sales of shares and exercise of stock options which it believed violated the [automatic orders], i.e., how did these transactions affect the court's final order." The trial court denied the motion for articulation, following which, the plaintiff sought review of that decision from this court. We granted the plaintiff's motion for review in part and

ordered the court to explain how it "took into account" the stock and stock option transactions in distributing the marital assets. With regard to our articulation order, the trial court stated: "As the Appellate Court frequently writes, financial orders in dissolution proceedings often have been described as a mosaic, in which all of the various financial components are carefully interwoven with one another. . . . Therefore, it is impossible to say with great specificity exactly how the court 'took into account' the sales of the shares and the exercise of the stock options by the plaintiff. However, these transactions by the plaintiff were taken into account when the defendant was awarded the family home and her pension from Credit Suisse, as well as the equitable division of all of the other assets of the parties."[10] (Citation omitted.)

Before turning to the plaintiff's claim, we first set forth the relevant standard of review and general principles of law that guide our decision. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 87–88, 995 A.2d 1 (2010).

General Statutes § 46b-81 is the sole source of authority for a trial court to distribute marital assets in a dissolution action. "Although it is well established that trial courts have broad equitable remedial powers regarding marital dissolutions . . . it is equally well settled that [c]ourts have no inherent power to transfer property from one spouse to another; instead, that power must rest upon an enabling statute." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Smith*, 249 Conn. 265, 272, 752 A.2d 1023 (1999).

Section 46b-81 provides in relevant part: "(a) At the time of entering a decree . . . dissolving a marriage . . . pursuant to a complaint under section 46b-45, the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . . (c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of

the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." Although "a trial court must consider all the statutory criteria in determining the financial awards and division of property in a dissolution action, the court is not required to recite the statutory criteria it considered in making its awards, nor is it required to make express findings as to each factor listed in the relevant statutes." *Zern* v. *Zern*, 15 Conn. App. 292, 295, 544 A.2d 244 (1988).

"The purpose of a property division pursuant to a dissolution proceeding is to unscramble existing marital property in order to give each spouse his or her equitable share *at the time of dissolution*." (Emphasis added.) *Smith* v. *Smith*, supra, 249 Conn. 275. In other words, it is well understood that all financial awards in a dissolution action should be based on the financial circumstances of the parties as they existed on the date that the judgment of dissolution was rendered. *Kremenitzer* v. *Kremenitzer*, 81 Conn. App. 135, 140, 838 A.2d 1026 (2004). Therefore, as a general rule, if a remand for new financial orders becomes necessary, absent some " 'exceptional intervening circumstances,' " the date of the dissolution judgment (here, September 18, 2009, and not the date of the new trial on financial orders) is the proper time at which the court should value components of the parties' estate in crafting its equitable property division orders. *Sunbury* v. *Sunbury*, 216 Conn. 673, 676, 583 A.2d 636 (1990). Although no appellate court has attempted to define in any precise manner what would constitute an exceptional, intervening circumstance, we have clarified previously that any increase or decrease in the value of property following the date of dissolution does not, in and of itself, constitute an exceptional circumstance justifying a deviation from the rule requiring the court to value the assets in the marital estate as of the date of dissolution. See id.; see also *Kremenitzer* v. *Kremenitzer*, supra, 81 Conn. App. 139–40; *Rolla* v. *Rolla*, 48 Conn. App. 732, 745, 712 A.2d 440, cert. denied, 245 Conn. 921, 717 A.2d 237 (1998). With these principles in mind, we turn to the plaintiff's claim.

The plaintiff claims that the court improperly determined that he violated the automatic orders set forth in Practice Book § 25-5 by selling stocks and exercising stock options during the pendency of the dissolution action without first obtaining the written consent of the defendant or an order of the judicial authority.[11] According to the plaintiff, it was inequitable, and, therefore, an abuse of discretion, for the court to have penal-

ized him for those financial transactions when it distributed the marital assets because his clear intent had been to protect marital assets in the face of a declining stock market and global financial crisis, and because he had preserved all of the cash proceeds from those transactions for distribution by the court.

In support of his claim, the plaintiff makes the following four arguments. First, the plaintiff argues that the defendant waived any claim regarding the impropriety of the predissolution stock sale because she raised the issue to the court for the first time on remand. Second, he argues that the 75,000 stock options that he exercised postdissolution were never marital property because they were awarded to him fourteen months after he filed for divorce, and, thus, his exercise of those options postdissolution did not implicate the automatic orders.[12] Third, the plaintiff relies on the exception in the language of the automatic orders permitting transactions that are carried out in "the usual course of business," arguing that this exception is applicable to the transactions at issue in the present case. Fourth, the plaintiff argues that even if his actions technically violated the automatic orders, they did not amount to a dissipation of the marital assets or otherwise cause any legally cognizable harm that should have affected the distribution of assets. We find this fourth argument persuasive.[13]

Specifically, for the following reasons, we agree that, even if the plaintiff technically violated the automatic orders when he sold stock and exercised options during the pendency of the dissolution action without permission from the defendant or the court, the resulting sanction imposed on the plaintiff by the court—namely, some unspecified reduction in the plaintiff's share of the marital estate—was not legally justified and, thus, an abuse of discretion.[14] First, the court expressly found that the plaintiff's actions were not contumacious, and, thus, we conclude that it lacked any authority to punish the plaintiff pursuant to its civil contempt powers. Second, although in exercising its statutory authority under § 46b-81, the court certainly could take into account, when dividing the parties' assets, whether a party had engaged in a dissipation of those assets, there is nothing in the present record that would support a finding that the plaintiff intended to hide or to dissipate assets, nor did the court make such a finding.

Although, as we have indicated, our resolution of this appeal does not turn on whether the court properly found that the defendant had violated the automatic orders, we nevertheless find it helpful to begin our discussion with the automatic orders. The court's automatic orders, applicable during the pendency of all marital dissolution actions, are set forth in Practice Book § 25-5 (b) and provide in relevant part: "(1) Neither party shall sell, transfer, exchange, assign, remove, or

in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action. . . ." The orders further provide that "[n]either party shall conceal any property. . . ." Practice Book § 25-5 (b) (2).

The purpose of the automatic orders in marital dissolution actions is to maintain the status quo of the assets within the marital estate so that they may be distributed by the court at the time of dissolution. See *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 233, 116 A.3d 297 (2015); *Parrotta* v. *Parrotta*, 119 Conn. App. 472, 483, 988 A.2d 383 (2010). As provided in bold print at the end of Practice Book § 25-5, the "[f]ailure to obey [the automatic] orders may be punishable by contempt of court. . . ." Practice Book § 25-5 (c). "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. . . . [If] compensation is intended, a fine is imposed, payable to the complainant." (Citation omitted; internal quotation marks omitted.) *DeMartino* v. *Monroe Little League, Inc.*, 192 Conn. 271, 278–79, 471 A.2d 638 (1984). Accordingly, in the context of a dissolution action, if a party is found in contempt of court for wilfully violating the court's automatic orders, the court is empowered to order a variety of remedial sanctions, including imposition of penalties and fines.

In the present case, however, the court rejected the defendant's argument that the plaintiff should be found in contempt for violating the automatic orders. Although the court found that the plaintiff's financial transactions had violated the automatic orders, it nevertheless concluded that he was not in wilful contempt because he had acted on the advice of counsel.[15] The court made no finding that the plaintiff had attempted to circumvent the beneficial purposes underlying the automatic orders by intentionally disposing of or wasting marital assets. Having determined that the plaintiff's transactions were not contumacious but rather, at least to some degree, were justified or made in good faith, the court lost its authority pursuant to its contempt powers to take any remedial action against the plaintiff simply because, with the luxury of hindsight, those transactions had proven unprofitable or even unwise. In other words, if the court had found the plaintiff in contempt of the automatic orders, that conclusion might have justified its further consideration of the effect those violations had on the assets available for distribution. In such circumstances, the court could have taken remedial action, perhaps reducing the plaintiff's distribution in an amount necessary to compensate the defendant. Nevertheless, having effectively denied

the defendant's motion for contempt, the court was required to dispose of the marital assets in accordance with its authority under § 46b-81, which did not include the power to punish in the absence of dissipation.

Our Supreme Court has stated that, pursuant to § 46b-81, trial courts have the statutory authority to consider if a spouse has dissipated marital assets when determining the nature and value of property to be assigned to each respective spouse. See *Finan* v. *Finan*, 287 Conn. 491, 500–501, 949 A.2d 468 (2008). Accordingly, the court would have had the authority to make a downward adjustment in the plaintiff's share of the marital assets if it had determined that the plaintiff's purported violations of the automatic orders amounted to a dissipation of marital assets.

"Generally, dissipation is intended to address the situation in which one spouse conceals, conveys or wastes marital assets in anticipation of a divorce. See 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:102, p. 539. Most courts have concluded that some type of improper conduct is required before a finding of dissipation can be made. Thus, courts have traditionally recognized dissipation in the following paradigmatic contexts: gambling, support of a paramour, or the transfer of an asset to a third party for little or no consideration." (Footnotes omitted.) *Gershman* v. *Gershman*, 286 Conn. 341, 346, 943 A.2d 1091 (2008). The court in *Gershman* stressed that "[p]oor investment decisions, without more, generally do not give rise to a finding of dissipation." Id., 348, and cases cited therein. It concluded that, "at a minimum, dissipation in the marital dissolution context requires financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety, coupled with a purpose unrelated to the marriage." Id., 351.

In the present case, however, there was no express finding by the court that the plaintiff had dissipated marital assets, nor would an implicit finding be supported by the record. Nothing in the record indicates that the plaintiff, by selling stock or exercising stock options, intended to waste marital assets or to hide assets from the defendant or the court. Indeed, the plaintiff was also harmed by any resulting loss to the marital estate from his transactions, as his share of any property distribution was similarly affected. The plaintiff's uncontested testimony at trial was that he was concerned in the face of the ongoing financial crisis that the stock and stock options would likely lose value given market conditions and, therefore, he decided it would be wise to convert those assets into cash. The fact that his noncontumacious financial decisions now appear, with the virtue of hindsight, to be imprudent does not mean that he dissipated assets. See id., 348; *Quasius* v. *Quasius*, 87 Conn. App. 206, 208–209, 866 A.2d 606, cert. denied, 274 Conn. 901, 876 A.2d 12 (2005).

Furthermore, the defendant has not alleged that the plaintiff engaged in any financial misconduct involving the proceeds of the stock sale or the exercise of the stock options, nor is any such conduct apparent from the record. Rather, the plaintiff placed all proceeds into bank accounts that he fully disclosed on his financial affidavits.

In sum, because the defendant was not in wilful contempt of the automatic orders and made no attempt to dissipate marital assets, it was an abuse of the court's legal discretion to take his purported violations of the automatic orders into account in dividing the marital assets. Because, as we have explained on numerous occasions, financial orders appurtenant to a dissolution of marriage are "a carefully crafted mosaic, each element of which may be dependent on the other"; *Ehrenkranz* v. *Ehrenkranz*, 2 Conn. App. 416, 424, 479 A.2d 826 (1984); we remand this matter to the trial court for a new trial on all financial issues in accordance with this opinion.

The judgment is reversed and the case is remanded for a new trial on all financial issues.

In this opinion the other judges concurred.

[1] Practice Book § 25-5 (b) provides in relevant part: "In all cases involving a marriage or civil union, whether or not there are children:

"(1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action. . . ."

Practice Book § 61-11 (c) makes clear that "[t]he automatic orders set forth in Section 25-5 (b) (1), (2), (3), (5) and (7) shall remain in effect during any appeal period and, if an appeal is taken, until the final determination of the cause unless terminated, modified or amended further by order of a judicial authority upon motion of either party. . . ." Accord Practice Book § 25-5 (automatic orders to remain in place "during the pendency of the action").

[2] In addition to challenging the propriety of the court's financial orders with respect to the plaintiff's purported violations of the automatic orders, the plaintiff also raises a number of other claims. In particular, the plaintiff claims that the court abused its discretion by ordering excessive alimony and child support payments, and by ordering an excessive lump sum retroactive alimony payment. The plaintiff also claims that the court improperly found that the defendant had been unaware of a pension account that she disclosed only a few days prior to the trial on remand. Because we reverse the court's financial orders on other grounds, and "the entirety of the [financial] mosaic must be refashioned" on remand; *Gershman* v. *Gershman*, 286 Conn. 341, 352, 943 A.2d 1091 (2008); we do not address these other claims of error.

[3] The plaintiff had become less and less committed to the marriage over time. Although the defendant may have ignored signs that the marriage was failing, she nevertheless remained committed to saving the relationship. The defendant has alleged throughout the divorce proceedings that the plaintiff engaged in an adulterous relationship. In his decision following the first trial, Judge Owens found that the defendant had failed to prove her allegations by a preponderance of the evidence; however, the court found that the plaintiff was primarily at fault for the breakdown of the marriage. In his decision following the trial on remand, Judge Pinkus also found that the defendant's allegations of adultery were unsubstantiated by the evidence.

[4] Judge Owens' property distribution order can only be interpreted as having treated all unvested stock options held by the plaintiff at the time of dissolution as marital property subject to equitable distribution. One of the arguments raised by the plaintiff in the present appeal is that the unvested stock options were never marital property, having been issued to the plaintiff

many months after he had filed for divorce, and, therefore, he could not have violated the automatic orders by later converting those options into cash.

The plaintiff never challenged in his prior appeal the court's treatment of the unvested stock options as marital property or their distribution. It is well established that an appellant forfeits any claim of error that he or she could have but failed to raise in a prior appeal. *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 319–20, 50 A.3d 841 (2012), cert. denied, U.S. , 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013). Because the plaintiff could have challenged the court's treatment of the stock options as marital property in his prior appeal but failed to do so, the plaintiff has waived his right to argue that the unvested stock options were not marital property and, thus, that their exercise could not have violated the automatic orders. The plaintiff similarly has waived any argument, now or on further remand, that the proceeds resulting from the exercise of those options are not subject to distribution by the court in accordance with General Statutes § 46b-81.

[5] In his first appeal, the plaintiff also raised claims that the court could not have properly crafted its financial orders because it failed to assign an earning capacity to the defendant, and that the court improperly had ordered him to maintain a life insurance policy benefiting the defendant for as long as he had an alimony obligation. See *O'Brien* v. *O'Brien*, supra, 138 Conn. App. 545 n.1. These claims were not reached by this court. Id.

[6] The plaintiff engaged in what was explained at trial by the defendant's expert as a "cashless exercise" of his options, wherein the stock options were converted into cash as part of a single brokerage transaction, permitting the plaintiff to realize the difference between the value of the stock on the public markets at the time of the transaction and the "strike price" of the option, which was the price at which the plaintiff had a legal right to purchase shares pursuant to the grant of the option.

[7] The defendant's expert did not testify as to what the value of the unvested stock options was on September 18, 2009, the date of dissolution, or what the shares of Omnicom that the plaintiff sold prior to dissolution would have been worth on that date. In our review of the record, we have not found any evidence of what those assets would have been worth as of the date of dissolution.

[8] In determining its alimony and child support orders, the court utilized an adjusted net income for the plaintiff calculated on the basis of his salary and cash bonus only; the court did not consider the noncash component of the plaintiff's salary.

[9] The parties do not agree as to the net effect of the court's property distribution orders. According to the plaintiff's calculations, the court effectively awarded the defendant at least 68 percent of the parties' assets. The defendant, on the other hand, calculates that the percentage effectively awarded to the defendant is closer to 62 percent of the parties' total assets. For purposes of our analysis, it is unnecessary for us to calculate the exact percentages awarded to each side because our resolution of the appeal does not turn on whether the court's overall percentage of assets awarded to the plaintiff was inequitable, but on whether, in balancing all equities involved, and in light of all relevant statutory criteria, the court impermissibly placed its thumb on the scale in favor of the defendant, at least in part, on the basis of what the court found were noncontumacious violations of the automatic orders by the plaintiff.

[10] In light of this response, we conclude that additional attempts to have the trial court articulate how it took into account the plaintiff's actions would not have been fruitful.

[11] The plaintiff asks us to announce a bright line rule in this case establishing that whenever any party to a dissolution action sells stock or exercises stock options in publicly traded companies on an established exchange, and thereafter retains or reinvests all of the resulting proceeds, such transactions will be deemed to have been made "in the usual course of business" and, thus, as not in violation of the automatic orders. The plaintiff argues that such a rule is necessary because parties often will need to make quick decisions about selling or trading stocks and other equities, especially during volatile markets, and that requiring the party to seek prior approval from the court would result in unnecessary and untenable delays. Further, according to the plaintiff, courts generally are ill-equipped to evaluate the appropriateness of a party's decision to engage in such transactions, resulting in the need for "minitrials" to evaluate the prudence of a particular transaction. The defendant disputes the need for such a rule, arguing that expedited hearings are already available and that such a rule would encourage parties

to engage in other forms of "self-help," which courts have rightly discouraged. See *In re Leah S.*, 284 Conn. 685, 700, 935 A.2d 1021 (2007) (recognizing existence of "important public policy against resorting to self-help tactics"). Because it is unnecessary for us to resolve in the present case whether the transactions at issue violated the automatic orders, we decline the plaintiff's invitation to consider the relative merits of establishing such a rule at this time.

[12] See footnote 4 of this opinion.

[13] Because we agree with the plaintiff's final argument in support of his claim on appeal, it is unnecessary for us to consider the plaintiff's remaining arguments, including whether, in light of the facts presented in the present case, the plaintiff's decision to convert stock and stock options into cash actually violated the automatic orders.

[14] Although we recognize that the court was unable or unwilling to articulate precisely how it had accounted for the plaintiff's violations of the automatic orders, we nevertheless construe the court's statement that those violations affected its decision to award the defendant "the family home and her pension from Credit Suisse, as well as the equitable division of all of the other assets of the parties" as an indication that the court skewed the distribution in favor of the defendant in a materially significant, although unquantifiable, amount.

[15] The defendant does not challenge on appeal the court's finding that the plaintiff was not in contempt of court. Accordingly, we take no position on whether a party may shield himself or herself from a finding of wilful contempt by showing that he or she relied on the advice of legal counsel.